Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: Semiconductor Manufacturing International Corporation Securities Litigation | Master File No. 2:20-cv-11219-GW-AFM<br><br>**SECOND CONSOLIDATED AMENDED COMPLAINT**<br><br>CLASS ACTION<br><br>Jury Trial Demanded |

Lead Plaintiff Edward Edmond K. L. To, and additional plaintiffs Patrick McCormick and Maurice O'Keefe ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, announcements, public filings, wire and press releases published by and regarding Semiconductor Manufacturing International Corporation ("SMIC" or the "Company"), and information readily obtainable on the

- 1 -

Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded SMIC ADRs between April 23, 2020 and September 26, 2020, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Semiconductor Manufacturing International Corporation ("SMIC") is the largest manufacturer of semiconductors in the People's Republic of China. US law prohibits US based entities from selling sensitive technologies to companies based in the PRC if those companies supply products for military end uses or military end users. In order to obtain cutting edge technology from the US to use in its manufacturing processes, SMIC has always maintained that it does not sell to military users or for military uses and assured investors that it had robust controls in place to prevent use of its products by the PRC military. Throughout the class period, SMIC repeatedly reassured investors that it complied with US export controls, and that it had robust internal controls in place to ensure compliance with US law.

3.      However, in August of 2020 the defense contractor SOS International provided a report to senior US government officials providing compelling evidence demonstrating that SMIC manufactured products for the People's Liberation Army and players within China's military industrial complex. Using a seemingly civilian technology company for military purposes fits within the Communist Party's doctrine of military civilian fusion, whereby civilian industries are co-opted into China's military ambitions.

Class Action Complaint for Violation of the Federal Securities Laws

4.     On September 5, 2020, media sources in the US reported for the first time that the US government had received the report from SOS International, and was considering placing SMIC on the "Entities List" of companies who are barred from receiving sensitive US technology exports, causing SMIC stock to plummet 20%. SMIC flatly and falsely denied that they had any ties to the PRC military. On September 26, 2020, the Commerce Department contacted SMIC's US based suppliers and instructed them to cease exporting sensitive technology to SMIC because of SMIC's ties to the Chinese military, triggering another decline in SMIC stock. Ultimately, in December of 2020, the US Commerce Department placed SMIC on the Entities List, and the Department of Defense identified it as a "Communist Chinese Military Company", barring the company from trading in the United States.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

6.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

7.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this judicial district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as Defendants conducts business in this District and a significant portion of the Defendants' actions and the subsequent damages took place within this District.

9.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of

Class Action Complaint for Violation of the Federal Securities Laws

interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

10.     Lead Plaintiff Edmond K L To, as set forth in the previously filed Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

11.     Plaintiff Patrick McCormick, as set forth in the previously filed certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

12.     Plaintiff Maurice O'Keefe, as set forth in the previously filed certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

13.     Defendant SMIC purports to be an investment holding company principally engaged in the computer-aided design, manufacture, testing, packaging and trading of integrated circuits ("IC"), as well as the provision of other semiconductor services. The Company is also involved in the design and manufacture of semiconductor masks and various types of wafers. The Company distributes its products in China and to overseas markets, such as Europe and also in the United States.

14.     The Company is incorporated in the Cayman Islands and its headquarters are located at No. 18 Zhangjiang Road, Pudong New Area, Shanghai 201203, People's Republic of China. The Company's sponsored American depositary receipts ("ADRs") trade over-the-counter on the OTCQX exchange under the ticker symbol "SMICY."

Class Action Complaint for Violation of the Federal Securities Laws

15. Defendant Zixue Zhou ("Zhou") has served as the Company's Chairman throughout the Class Period. Zhou joined the Company on March 6, 2015 as an executive director and Chairman of the Board. Before this, Dr. Zhou severed as the Chief Economist and the Director of Finance of the PRC Ministry of Industry and Information Technology. Prior to that, he worked in several divisions in the PRC Ministry of Information Industry, the PRC Ministry of Electronics Industry, the PRC Ministry of Machinery and Electronics Industry, and the PRC state owned DongGuangDian Factory. Dr. Zhou is currently the Vice Chairman and Secretary General of the China Information Technology Industry Federation, the Chairman of the China Semiconductor Industry Association, the Chairman of the Board of Jiangsu Changdian Electronics Technology Co., Ltd, an independent director of Yunnan Nantian Electronics Information Co., Ltd, and an independent director of Hisense Electric Co., Ltd. Dr. Zhou also serves as a director of certain subsidiaries of the Company.

16. Defendant Hai Jun Zhao ("Zhao") has served as the Company's Co-Chief Executive Officer ("Co-CEO") and Executive Director throughout the Class Period. Zhao became an Executive Director of SMIC on October 16, 2017, and Chief Executive Officer of SMIC on May 10, 2017 and re-designated as Co-Chief Executive Officer on October 16, 2017. Dr. Zhao joined SMIC in October 2010 and was appointed as Chief Operating Officer and Executive Vice President in April 2013. In July 2013, Dr. Zhao was appointed as General Manager of Semiconductor Manufacturing North China (Beijing) Corporation, a joint venture company established in Beijing and a subsidiary of SMIC.  He has 27 years of experience in semiconductor operations and technology development. Dr. Zhao has also served as an independent director on the board of directors of Zhejiang Juhua Co., Ltd., since November 2016. Dr. Zhao also has served as a director of certain subsidiaries of SMIC.

Class Action Complaint for Violation of the Federal Securities Laws

17.     Mong Song Liang ("Liang") has served as the Company's Co-CEO and Executive Director throughout the Class Period and became the Executive Director and Co-Chief Executive Officer of SMIC on October 16, 2017. Dr. Liang held a senior director position on research and development in Taiwan Semiconductor Manufacturing Company Limited between 1992 and 2009.

18.     Defendants Zhou, Zhao, and Liang are collectively referred to herein as the "Individual Defendants."

19.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

20.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

Class Action Complaint for Violation of the Federal Securities Laws

21.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

22.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

**US Regulations Restrict Sale of Technology to Companies on "Entities List"**
**And Generally Forbids Export of Technology to China for Military End Use**

23.     14 CFR Subchapter C contains the US Department of Commerce Export Administration Regulations (the "EAR"). 14 CFR Part 744 contains the portion of the EAR that restricts exports of sensitive technologies with a potential for military applications. 15 CFR § 744.21 forbids export of sensitive technologies to "military end use" or "military end users" in the People's Republic of China and several other countries.

24.     In addition to the general prohibition against knowingly exporting technologies for military end users or military end use, the Commerce Department also may require a US Exporter to obtain a license to export sensitive technology to a specific PRC based firm. They can notify suppliers of this requirement in two ways. First, by communicating directly to US exporters that exporting to the PRC firm creates an unacceptable risk of falling into military end use. Second, the Commerce Department cam place the company on the "Entities List."

25.     The Bureau of Industry and Security ("BIS") of the US Commerce Department maintains a list of businesses, research institutions, government and private organizations that US firms cannot sell to without first obtaining a special and difficult to obtain license. The purpose of this list is to prevent the use of technology for purposes that are contrary to US national security or foreign policy interests. During the past several years, the Commerce Department has placed numerous

Class Action Complaint for Violation of the Federal Securities Laws

Chinese companies on the Entity List because those Chinese companies created products for Chinese military end users.

26.     As the US Bureau of Industry and Security explains:

> The Entity List (supplement No. 4 to part 744 of the Export Administration Regulations (EAR)) identifies entities for which there is reasonable cause to believe, based on specific and articulable facts, that the entities have been involved, are involved, or pose a significant risk of being or becoming involved in activities contrary to the national security or foreign policy interests of the United States. The EAR (15 CFR parts 730-774) impose additional license requirements on, and limit the availability of most license exceptions for, exports, reexports, and transfers (in-country) to listed entities.

27.     By contrast, a PRC based company can obtain "Validated End User" ("VEU") status with the US Department of Commerce. A VEU is a foreign entity that has essentially been pre-cleared to receive sensitive technologies from US exporters without the need for the exporter to obtain a license to export. The regulations governing VEUs state that items exported to VEUs located in the People's Republic of China must only use the exported technology for civilian purposes. Obtaining and maintaining VEU status requires submitting to US government inspection.

**US Law Requires the Department of Defense to Identify Communist Chinese Military Companies**

28.     The 1999 US National Defense Authorization Act, at Section 1237, requires the Department of Defense to designate Enacted in 1998, Section 1237 directed the Secretary of Defense, in consultation with the Attorney General, the Director of the Federal Bureau of Investigation, and the Director of Central Intelligence, to identify Communist Chinese Military Companies ( "CCMCs") "that operate directly or indirectly in the United States or any of its territories or possessions." NDAA FY99 § 1237(b). Section 1237 defines CCMC as a person that "(i) is owned or controlled by, or affiliated with, the People's Liberation Army or a ministry of the government of the People's Republic of China or that is owned or

controlled by an entity affiliated with the defense industrial base of the People's Republic of China; and (ii) is engaged in providing commercial services, manufacturing, producing, or exporting," id. § 1237(b)(4)(B), or persons identified in certain intelligence publications, id. § 1237(b)(4)(A). The statute further defines "People's Liberation Army" as "the land, naval, and air military services, the police, and the intelligence services of the Communist Government of the People's Republic of China, and any member of any such service or of such police." Id. § 1237(c).

## On November 12, 2020, Donald Trump Issued Executive Order 13959, Forbidding CCMCs from Trading in the United States

29.    On November 12, 2020, then-President Donald Trump issued Executive Order 13959, titled "Addressing the Threat From Securities Investments That Finance Communist Chinese Military Companies" It stated

> By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 et seq.), and section 301 of title 3, United States Code,

> I, DONALD J. TRUMP, President of the United States of America, find that the People's Republic of China (PRC) is increasingly exploiting United States capital to resource and to enable the development and modernization of its military, intelligence, and other security apparatuses, which continues to allow the PRC to directly threaten the United States homeland and United States forces overseas, including by developing and deploying weapons of mass destruction, advanced conventional weapons, and malicious cyber-enabled actions against the United States and its people.

> Key to the development of the PRC's military, intelligence, and other security apparatuses is the country's large, ostensibly private economy. Through the national strategy of Military-Civil Fusion, the PRC increases the size of the country's military-industrial complex by compelling civilian Chinese companies to support its military and intelligence activities. Those companies, though remaining ostensibly

Class Action Complaint for Violation of the Federal Securities Laws

private and civilian, directly support the PRC's military, intelligence, and security apparatuses and aid in their development and modernization.

At the same time, those companies raise capital by selling securities to United States investors that trade on public exchanges both here and abroad, lobbying United States index providers and funds to include these securities in market offerings, and engaging in other acts to ensure access to United States capital. In that way, the PRC exploits United States investors to finance the development and modernization of its military.

I therefore further find that the PRC's military-industrial complex, by directly supporting the efforts of the PRC's military, intelligence, and other security apparatuses, constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States. To protect the United States homeland and the American people, I hereby declare a national emergency with respect to this threat.

Accordingly, I hereby order:

Section 1. (a) The following actions are prohibited:

(i) beginning 9:30 a.m. eastern standard time on January 11, 2021, any transaction in publicly traded securities, or any securities that are derivative of, or are designed to provide investment exposure to such securities, of any Communist Chinese military company as defined in section 4(a)(i) of this order, by any United States person; and

(ii) beginning 9:30 a.m. eastern standard time on the date that is 60 days after a person is determined to be a Communist Chinese military company pursuant to section (4)(a)(ii) or (iii) of this order, any transaction in publicly traded securities, or any securities that are derivative of, or are designed to provide investment exposure to such securities, of that person, by any United States person.

(b) Notwithstanding subsection (a)(i) of this section, purchases for value or sales made on or before 11:59 p.m. eastern standard time on November 11, 2021, solely to divest, in whole or in part, from securities that any United States person held as of 9:30 a.m. eastern standard time

Class Action Complaint for Violation of the Federal Securities Laws

on January 11, 2021, in a Communist Chinese military company as defined in section 4(a)(i) of this order, are permitted.

(c) Notwithstanding subsection (a)(ii) of this section, for a person determined to be a Communist Chinese military company pursuant to section 4(a)(ii) or (iii) of this order, purchases for value or sales made on or before 365 days from the date of such determination, solely to divest, in whole or in part, from securities that any United States person held in such person, as of the date 60 days from the date of such determination, are permitted.

(d) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the date of this order.

Sec. 2. (a) Any transaction by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

…

Sec. 4. Definitions. For purposes of this order:

(a) the term "Communist Chinese military company" means

(i) any person that the Secretary of Defense has listed as a Communist Chinese military company operating directly or indirectly in the United States or in any of its territories or possessions pursuant to section 1237 of Public Law 105-261, as amended by section 1233 of Public Law 106-398 and section 1222 of Public Law 108-375, as of the date of this order, and as set forth in the Annex to this order, until such time as the Secretary of Defense removes such person from such list;

(ii) any person that the Secretary of Defense, in consultation with the Secretary of the Treasury, determines is a Communist Chinese military company operating directly or indirectly in the United States or in any of

- 11 -

Class Action Complaint for Violation of the Federal Securities Laws

its territories or possessions and therefore lists as such pursuant to section 1237 of Public Law 105-261, as amended by section 1233 of Public Law 106-398 and section 1222 of Public Law 108-375, until such time as the Secretary of Defense removes such person from such list; or

(iii) any person that the Secretary of the Treasury publicly lists as meeting the criteria in section 1237(b)(4)(B) of Public Law 105-261, or publicly lists as a subsidiary of a person already determined to be a Communist Start Printed Page 73187Chinese military company, until the Secretary of the Treasury determines that such person no longer meets that criteria and removes such person from such list.

(b) the term "entity" means a government or instrumentality of such government, partnership, association, trust, joint venture, corporation, group, subgroup, or other organization;

(c) the term "person" means an individual or entity;

(d) the terms "security" and "securities" include the definition of "security" in section 3(a)(10) of the Securities Exchange Act of 1934, Public Law 73-291, as codified as amended at 15 U.S.C. 78c(a)(10), except that currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding 9 months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited, shall be a security for purposes of this order.

(e) the term "transaction" means the purchase for value of any publicly traded security; and

(f) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States.

## On June 3, 2021, President Biden Modifies Trump's November 12, 2020 Order, Refining the Definition of a Communist Chinese Military Company

30.   On June 3, 2021, President Joseph Biden issued an Executive Order titled "Addressing the Threat From Securities Investments That Finance Certain Companies of the People's Republic of China". It stated:

- 12 -

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 et seq.) (NEA), and section 301 of title 3, United States Code,

I, JOSEPH R. BIDEN JR., President of the United States of America, find that additional steps are necessary to address the national emergency declared in Executive Order 13959 of November 12, 2020 (Addressing the Threat From Securities Investments That Finance Communist Chinese Military Companies), including the threat posed by the military-industrial complex of the People's Republic of China (PRC) and its involvement in military, intelligence, and security research and development programs, and weapons and related equipment production under the PRC's Military-Civil Fusion strategy. In addition, I find that the use of Chinese surveillance technology outside the PRC and the development or use of Chinese surveillance technology to facilitate repression or serious human rights abuse constitute unusual and extraordinary threats, which have their source in whole or substantial part outside the United States, to the national security, foreign policy, and economy of the United States, and I hereby expand the scope of the national emergency declared in Executive Order 13959 to address those threats.

Accordingly, I hereby order as follows:

Section 1. Sections 1 through 5 of Executive Order 13959, as amended by Executive Order 13974 of January 13, 2021 (Amending Executive Order 13959—Addressing the Threat From Securities Investments That Finance Communist Chinese Military Companies), are hereby replaced and superseded in their entirety to read as follows:

"Section 1. (a) The following activities by a United States person are prohibited: the purchase or sale of any publicly traded securities, or any publicly traded securities that are derivative of such securities or are designed to provide investment exposure to such securities, of any person listed in the Annex to this order or of any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, and, as the Secretary of the Treasury deems appropriate, the Secretary of Defense:

Class Action Complaint for Violation of the Federal Securities Laws

(i) to operate or have operated in the defense and related materiel sector or the surveillance technology sector of the economy of the PRC; or

(ii) to own or control, or to be owned or controlled by, directly or indirectly, a person who operates or has operated in any sector described in subsection (a)(i) of this section, or a person who is listed in the Annex to this order or who has otherwise been determined to be subject to the prohibitions in subsection (a) of this section.

(b) The prohibitions in subsection (a) of this section shall take effect:

(i) beginning at 12:01 a.m. eastern daylight time on August 2, 2021, with respect to any person listed in the Annex to this order; or

(ii) beginning at 12:01 a.m. eastern daylight time on the date that is 60 days after the date of the determination in subsection (a) of this section with respect to any person not listed in the Annex to this order.Start Printed Page 30146

(c) The purchase or sale of publicly traded securities described in subsection (a) of this section made solely to effect the divestment, in whole or in part, of such securities by a United States person is permitted prior to:

(i) 12:01 a.m. eastern daylight time on June 3, 2022, with respect to any person listed in the Annex to this order; or

(ii) 12:01 a.m. eastern daylight time on the date that is 365 days after the date of the determination in subsection (a) of this section with respect to any person not listed in the Annex to this order.

(d) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the date of this order.

Sec. 2. (a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

Class Action Complaint for Violation of the Federal Securities Laws

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

Sec. 3. For the purposes of this order:

(a) the term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization

(b) the term "person" means an individual or entity;

(c) the term "publicly traded securities" includes any "security," as defined in section 3(a)(10) of the Securities Exchange Act of 1934, Public Law 73-291 (as codified as amended at 15 U.S.C. 78c(a)(10)), denominated in any currency that trades on a securities exchange or through the method of trading that is commonly referred to as "over-the-counter," in any jurisdiction; and

(d) the term "United States person" means any United States citizen, lawful permanent resident, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States.

## **COMPANY BACKGROUND**

31.     Semiconductor Manufacturing International Corporation (SMIC, 中芯国际; also known as Zhongxin International) is the largest semiconductor foundry operator in the People's Republic of China, and, according to SMIC, also the country's most advanced chipmaker.

32.     SMIC's primary subsidiary is SMIC (Shanghai).

33.     SMIC frequently imported parts, tools, and technology from US companies.

34.     Beginning in 2007, SMIC maintained VEU status. In 2016, SMIC requested to be removed from the list of VEUs, thereby ending US government inspection of SMIC facilities to confirm that their products were for civilian end use only.

35.     Because SMIC manufactures semiconductors, which have a high potential for military use, SMIC addressed its procedures to ensure compliance with

Class Action Complaint for Violation of the Federal Securities Laws

US export controls in its annual corporate social responsibility report. It stated, in pertinent part:

> Export Compliance Management
>
> SMIC establishes an internal compliance program (ICP) to ensure our compliance with international export control laws and treaties on high-technology products. ***The United States and many other countries have joined the international export control system.*** Suppliers and customers in these countries generally need to obtain export licenses to transport controlled items (such as equipment, parts, materials, software, or technology) to China. ***We, as well as relevant suppliers and customers, strictly abide by the restrictions and regulations of these export licenses.*** We incorporate the internal compliance program into the ICP handbook, including policies and procedures to ensure compliance with all legal requirements. Our ICP handbook contains 10 elements[.] [Chart omitted.]
>
> In order for all employees to fully understand our internal compliance obligations, the CEO issues an export compliance policy statement that must be acknowledged and signed by all employees. Our ICP team conducts regular training and maintains the ICP web page on our company intranet. Meanwhile, our ICP compliance is verified in regular audits by vendors and government officials.

36.     Similarly, SMIC's Code of Business Conduct and Ethics states

> As a company doing business with customers in the United States, we also need to follow the Foreign Corrupt Practices Act and the U.S. Export Control Act, in addition to applicable local laws of United States and Hong Kong Special Administrative Region. Each employee, agent and contractor must acquire appropriate knowledge of the requirements relating to his or her duties sufficient to enable him or her to recognize potential dangers and to know when to seek advice from the Legal Department and/or the Compliance Office on specific Company policies and procedures.

37.     The Code of Business Conduct and Ethics also states

> A number of countries maintain controls on the destinations to which products or software may be exported. Some of the strictest export

Class Action Complaint for Violation of the Federal Securities Laws

controls are maintained by the United States against countries that the U.S. government considers unfriendly or as supporting international terrorism. The U.S. regulations are complex and apply both to exports from the United States and to exports of products from other countries, when those products contain U.S.-origin components or technology. Software created in the United States is subject to these regulations even if duplicated and packaged abroad. In some circumstances, an oral presentation containing technical data made to foreign nationals in the United States may constitute a controlled export. The Legal Department can provide you with guidance on which countries are prohibited destinations for Company products or whether a proposed technical presentation to foreign nationals may require a U.S. government license.

## **SMIC's Cooperation with the People's Liberation Army**

38.    On August 20, 2020, the defense contractor firm SOS International provided senior US government officials with a report titled Blue Heron, Semiconductor Manufacturing International Corporation (the "SOS Report"), attached hereto as Exhibit A.

39.    According to the SOS Report

Since 1989, SOS International (SOSi) has provided specialized services supporting the national security interests of the United States and the security and stability needs of its allies. SOSi advances public safety and national security through innovative research, analysis and applied technology. SOSi conducts research and analysis in key areas of defense and intelligence work, provides high-level systems engineering services to selected national and homeland security organizations, and produces hardware and software products for government and commercial consumers.

This project was conducted within SOSi's Intelligence Solutions Group. Staffed by an experienced cadre of cleared analysts with advanced language skills, our mission is to provide cutting-edge, open source, and cultural intelligence support to the collection, analytical, and operational activities of the U.S. intelligence community, Department of Defense, and Federal law enforcement.

40.    James Mulvenon, the author of the SOS Report, has been retained by the United States Department of Justice as an expert on matters related to Chinese

Class Action Complaint for Violation of the Federal Securities Laws

industrial espionage on three separate occasions. He submitted expert reports in *United States v. Xu*, 18-CR-43 (S.D. Ohio); *United States v. Zhang*, 15-CR-00106 (N.D. Cal.); and *United States v. Shi*, 17-CR-00110 (D.D.C.).

41. The SOS Report revealed evidence demonstrating that SMIC manufactured chips for the People's Liberation Army. According to the SOS Report, Researchers at PLA operated universities designed chips that were specifically configured to be built at SMIC foundries. Because the nature of the manufacturing process, if someone designs a chip for SMIC foundries, no other manufacturer can use that design and manufacture chips. Therefore PLA researchers would only go through the effort of designing chips for SMIC foundries if SMIC was actually willing to manufacture the chips.

42. The SOS Report also states that military universities under the control of the PRC Ministry of Industry and Information Technology ("MIIT") use SMIC chips in their research.

43. MIIT oversees a substantial portion of the PRC's defense related research and is responsible for implementing technology and laws involved in domestic mass surveillance. For instance, as RFI reported on October 15, 2019, MIIT implemented a regulation compelling that forced all users of cellular phones in the People's Republic of China to register using their real names, verified through facial recognition software.

44. MIIT also oversees China's defense industry through the State Administration for Science, Technology and Industry for National Defense.

45. According to the Georgetown Center for Security and Emerging Technology, MIIT also oversees seven military universities entitled "The Seven Sons of National Defense", universities with extensive historical ties to the Chinese Defense Industry that focus on training students in technologies related to national defense. The Seven Sons were all placed on the Entities List. 85 FR 83416.

Class Action Complaint for Violation of the Federal Securities Laws

46.     According to a filing by the US Government in *Xiaomi Corp. v. US Dep't of Defense*, Civil Docket No. 21-cv-00280 (D.D.C. 2021) the MIIT helps manage the Chinese Communist Party's "military-civil fusion" ("MCF") strategy. According to the State Department, the goal of MCF "is to enable the PRC to develop the most technologically advanced military in the world." Therefore, "a key part of MCF is the elimination of barriers between China's civilian research and commercial sectors, and its military and defense industrial sectors." The Communist Party implements this strategy in part "by acquiring and diverting the world's cutting-edge technologies – including through theft – in order to achieve military dominance."

47.     The SOS Report further revealed that Chinese university researchers, including researchers at PLA affiliated universities, used SMIC's Process Design Kit in designing radiation hardened integrated circuits. A process design kit is a set of computer files used within the semiconductor industry to design an integrated circuit. Each process design kit is designed to work with a particular foundry. Therefore, researchers would not use SMIC's process design kit unless SMIC would ultimately manufacture the chips. Plaintiffs' counsel has conferred with SOS International and they informed Plaintiffs' counsel that they conferred with experts in the semiconductor industry who confirmed that a chip designed with SMIC's Process Design Kit would be useless unless it was actually manufactured by SMIC. In addition, SMIC's website indicates that PDKs are available to customers. https://www.smics.com/en/site/design_process.     Radiation hardening has two functions: to protect integrated circuits that are sent into space, or to protect circuits from electromagnetic pulses, particularly those caused by a nuclear blast. The SOS Report cited an article on radiation hardened IC design, relying on the SMIC PDK, published by the journal *Symmetry*, Authored by Jizuo Zhang Jianjun Chen, Penchan huang, Souping Li, and Liang Fang, all of whom, according to the *Symmetry* article, are affiliated with the College of Computer, National University of Defense

Class Action Complaint for Violation of the Federal Securities Laws

Technology in Hunan, China. Plaintiff's counsel reviewed this document and verified the accuracy of the SOS Report's description.

48.     The SOS Report also identified papers issued by some of the Seven Sons of National Security universities that indicated that researchers at those universities developed prototype radiation hardened chips using SMIC technology. For example, researchers at Bejing Institute of Technology published a paper titled "A Multi-mode SAR Imaging Chip based on a Dynamically Reconfigurable SoC Architecture Consisting of Dualoperation Engines and Multilayer Switching Network" which indicated that it relied on SMIC chip designs. Plaintiff's counsel reviewed this document and verified the accuracy of the SOS Report's description. In another example, researchers at Nanjing University of Aeronautics and Astronautics published a paper titled "The Design of Compact SM4 Encryption and Decryption Circuits That Are Resistant to Bypass Attack" which indicated that it relied on SMIC chip designs. Plaintiff's counsel reviewed this document and verified the accuracy of the SOS Report's description. Both of these universities are on the entities list. 85 FR 83416.

49.     The SOS Report also revealed close ties between the Chinese Communist Party and SMIC, including personal connections between SMIC senior executives and communist party members.

50.     Top leaders of the Chinese Communist Party have toured SMIC facilities. For example, the head of Shanghai's Committee on Information and the Economy toured SMIC's facility in 2019 and met with Defendant Zhou Zixue. The SOS Report cited an article on the Shanghai government's website for this information. Subsequent to the publication of the SOS Report, the Shanghai government removed that information from its website. However, Plaintiffs' counsel spoke with SOS International and they provided Plaintiffs' counsel with a pdf copy of article from the Chinese investing website xueqiu.com that also confirms that the head of Shanghai's Committee on Information and the Economy toured SMIC's

Class Action Complaint for Violation of the Federal Securities Laws

facility in 2019 and met with Defendant Zhou Zixue. Plaintiffs' counsel have reviewed the article and verified its content.

51.     Ying Yong, A member of the Central Committee of the Communist Party, visited SMIC to inspect its production line. SMIC officials briefed Ying on the project's status and he in turn asked them where they needed support. Ying stated that integrated circuits were "China's national treasure" and a strategic industry. He also stated that Shanghai would "take the initiative in serving national strategies" and work to create China's most complete, most technologically advanced, and most competitive IC industry system. The SOS Report cited an article at sina.com.cn, a major Chinese news site. Plaintiff's counsel reviewed this document and verified the accuracy of the SOS Report's description.

52.     The Ministry of Industry and Information Technology Vice Minister, Wang Jianping, led an inspection tour of SMIC's production line. The SOS Report cited an article on the MIIT website. Subsequent to the publication of the SOS Report, the article was removed from MIIT's website. However, Plaintiffs' counsel spoke with SOS International and they provided Plaintiffs' counsel with a pdf copy of article from the Chinese website cnstjj.com. Plaintiffs' counsel have reviewed the article and verified its content.

53.     The SOS Report also stated that Ma Kai, the Vice Premier and a Politburo[1] member took a tour of SMIC facilities as well, accompanied by Miao Ke, the head of MIIT, Ding Xuedong, the chairman and CEO of China's sovereign wealth fund China Investment Corporation, and the Deputy Mayor of Beijing Yin Hejun. SMIC Chairman Zhou Zixue accompanied the officials and gave them a work report on the state of China's integrated circuit industry, SMIC's recent accomplishments

---

[1] The Politburo of the Chinese Communist Party, formally known as the Central Political Bureau of the Communist Party of China is the decision-making body of the Chinese Communist Party (CCP). Currently, it is a group of 25 top officials who oversee the CCP.

and future plans, and policies that would help develop China's semiconductor industry. Ma Kai offered his approval and support of SMIC's progress. The SOS Report cited an article in Electronic Engineering and Product World, a Chinese language electronics magazine under the supervision of the Ministry of Science and Technology of the People's Republic of China. Plaintiff's counsel has reviewed the cited article and verifies that its contents match what the SOS Report stated.

## **Materially False and Misleading Statements**

54.     On April 23, 2020, SMIC filed its 2019 Annual Report with the Stock Exchange of Hong Kong (the "HKEX"). The 2019 Annual Report included a "Letter to Shareholders" which was signed by Defendants Zhou, Zhao, and Liang, and stated the following regarding SMIC's overseas relationships and business:

> . . . Over the past two years, through strenuous corporate reform, we have built up stronger and more competent R&D, operations, supporting teams, and management, while successfully developing and preparing a variety of technology platforms. ***We also have strengthened mutual trust and cooperation with domestic and overseas customers and suppliers. The foundation laid by these vigorous efforts has further strengthened our confidence in the future.***

(Emphasis added.)

55.     The foregoing statement was materially misleading for failing to disclose that, by manufacturing products for military end use, SMIC was jeopardizing its relationships with its US based suppliers, who faced civil and criminal liability for exporting to SMIC.

56.     The 2019 Annual Report stated the following, in pertinent part, regarding the Company's controls, risks, and compliance:

## **SOCIAL RESPONSIBILITY**

***At SMIC, we comply with strict legal requirements for corporate governance, financial accounting, and transparent reporting. Our***

Class Action Complaint for Violation of the Federal Securities Laws

> ***business practices also are ethical, safe, environmentally friendly, and fair to our employees, in accordance with all the laws, rules, and regulations of the countries where we operate. In addition to obeying the letter and mandates of such laws, we seek to promote their spirits.*** Through our CSR Program (http://www.smics.com/en/site/responsibility_social), we hope to advance social, environmental, and ethical responsibility according to internationally recognized standards.

(Emphasis added.)

57.     The foregoing statement was misleading for failing to disclose that SMIC was not complying with US laws regarding use of imported technology for military end use.

58.     On May 14, 2020, SMIC conducted a call with analysts regarding its quarterly earnings. On that call Defendant Zhao answered a question from Randy Abrams, an analyst with Credit Suisse.

> Abrams: Okay. If I could ask on the advanced nodes for 14 where you'll be adding a good amount of capacity, if you could give on how that may apply to the revenue ramp-up, like, what percent of revenue where it's been about 1% now, but how you see it ramping toward 10% of revenue? And how concentrated is the customer base? Just if you sort of move ahead with restrictions on one of your top customers, if you can use that capacity for other application for customers.
>
> **And on the other US restriction, if you could just talk if you have any impact from some of the license requirements. It seems kind of vague and broad, but on military use, if any impact on your ability to secure tools?**
>
> Zhao: Randy, actually, too many questions. You got to minimize it to 2. One is a 14-nanometer contribution and Mong Song will give you the answer. **Another question is the potential impact from the restrictions of US government on the machines that they sell to SMIC.** I'll answer the second question first. SMIC is international company. We have been – to have the communications with the supplier side on American Department of Commerce pretty well in the past 20 years**. And we follow the rules for the compliance, and so far,**

Class Action Complaint for Violation of the Federal Securities Laws

**perfectly. And we have the commitment for the non-military use from day one, 20 years back. So now we are in the same situation. We have the full commitment. We have the full compliance.** And at this moment, we do not see a big change in policy or way of doing things.

59.     The foregoing statement was misleading for failing to disclose that 1) SMIC was not complying with US laws regarding use of imported technology for military end use; 2) SMIC was in fact manufacturing products for military end use.

60.     On July 7, 2020, SMIC filed with the HKEX its 2019 Corporate Social Responsibility Report which stated, in pertinent part, regarding the Company's compliance:

> **As an international company, SMIC must comply with strict legal requirements for corporate governance, financial accounting, and transparent reporting. Our business practices also must be ethical, safe, environmentally sound, and fair to our employees, in accordance with all the laws, rules, and regulations of the countries where we operate.**

> \*     \*     \*

> Social Responsibility Policy

> ***In addition to obeying the letter and mandates of such laws, we seek to promote their spirits.*** Through our CSR Program, we hope to advance social, environmental, and ethical responsibility according to internationally recognized standards. In short, we intend to remain worthy of our inclusion in the Hang Seng Corporate Sustainability Index Series as a company that has "attained a high standard of performance in the environmental, social and corporate governance areas".

61.     The foregoing statement was misleading for failing to disclose that SMIC was at that time violating US law by manufacturing products for military end use.

62.     The Corporate Social Responsibility Report also stated:

> **Regulatory Compliance**

- 24 -

**Export Compliance Management**

SMIC establishes an internal compliance program (ICP) to ensure our compliance with international export control laws and treaties on high-technology products. ***The United States and many other countries have joined the international export control system.*** Suppliers and customers in these countries generally need to obtain export licenses to transport controlled items (such as equipment, parts, materials, software, or technology) to China. ***We, as well as relevant suppliers and customers, strictly abide by the restrictions and regulations of these export licenses.*** We incorporate the internal compliance program into the ICP handbook, including policies and procedures to ensure compliance with all legal requirements. Our ICP handbook contains 10 elements[.] [Chart omitted.]

In order for all employees to fully understand our internal compliance obligations, the CEO issues an export compliance policy statement that must be acknowledged and signed by all employees. Our ICP team conducts regular training and maintains the ICP web page on our company intranet. Meanwhile, our ICP compliance is verified in regular audits by vendors and government officials.

(Emphasis added.)

63.     The foregoing statement was materially misleading for failing to disclose 1) that SMIC was violating US export control regulations; 2) that SMIC was violating the restrictions of SMIC's export control licenses; 3) that by selling products to military end users, was engaging in activity that, had its suppliers known of them, would have prevented its suppliers from selling to SMIC because any such sales would not be compliant with US export control regulations.

64.     On September 4, 2020, after market hours, *Reuters* published an article entitled "EXCLUSIVE-Trump administration weighs blacklisting China's chipmaker SMIC" which announced the following, in pertinent part:

Class Action Complaint for Violation of the Federal Securities Laws

1
2
3

The Trump administration is considering whether to add China's top chipmaker SMIC to a trade blacklist, a Defense Department official said on Friday, as the United States escalates its crackdown on Chinese companies.

4
5
6
7

A Pentagon spokeswoman said the Defense Department was working with other agencies to determine whether to make the move against Semiconductor Manufacturing International Corporation, which would force U.S. suppliers to seek a difficult-to-obtain license before shipping to the company.

8

65.    On September 5, 2020, SMIC issued the following statement:

9
10
11

Reuters reported Friday, September 4 (EST), citing a Defense Department official that the Trump administration is considering whether to add China's top chipmaker SMIC to a trade blacklist.

12
13
14
15
16
17
18
19
20
21
22
23
24
25

SMIC solemnly declares that the Company, a public company listed on the Hong Kong Stock Exchange and the Sci-Tech Innovation Board (STAR Market), is an international semiconductor foundry **strictly complying with the laws and regulations of all jurisdictions where it performs its businesses**. Since its inception, the Company has been fully compliant with all rules and laws. SMIC has maintained long-term strategic partnerships with multiple U.S.-based semiconductor equipment suppliers. Over the years, the Bureau of Industry and Security (BIS) has granted numerous export licenses for the Company. With a large and diverse customer base, serving companies in the U.S., Europe, and other Asian regions, SMIC plays an important role in the global semiconductor supply chain. **The Company manufactures semiconductors and provides services solely for civilian and commercial end-users and end-uses. We have no relationship with the Chinese military.** In and before 2016, SMIC had been granted Validated End-User (VEU) authorization by the BIS and the company hosted several visits from U.S. Government officials. **Any assumptions of the Company's ties with the Chinese military are untrue statements and false accusations.** The Company is in complete shock and perplexity to the news.

26
27

66.    The foregoing statement was materially misleading for falsely claiming that SMIC does not provide products and services for military end use.

28

Class Action Complaint for Violation of the Federal Securities Laws

# THE TRUTH EMERGES

67.    On September 6, 2020 CNBC published an article titled  "U.S. Weighs Export Controls on China's Top Chip Maker."

> A research report produced last month by U.S. defense contractor SOS International LLC and circulated widely among officials involved in the review argues that it does.
>
> The report says the company has worked with one of China's largest defense conglomerates and that researchers at universities linked to China's military have designed their work to fit SMIC technology. They include a Chinese military academy that the Commerce Department placed on an export blacklist in 2015 for its alleged work designing chips used in supercomputers that simulate nuclear tests.
>
> "A series of PLA university and defense industrial complex researchers use SMIC processes and chips to conduct their research, indicating that this research is tailored to SMIC production specifications, making it impossible for them to manufacture their chips at another foundry," according to the report, which cites references to use of SMIC chip technologies in work published by researchers at what it describes as military-affiliated universities. PLA refers to China's armed forces, the People's Liberation Army.
>
> The SOS International report has been shared with officials at several agencies in the Trump administration, including with the Commerce Department's Bureau of Industry and Security, the people briefed on the discussions said. The agency is responsible for overseeing restrictions on exports of sensitive U.S. technology.
>
> A SMIC spokeswoman denied the report's findings, saying in an email that SMIC "has made full commitment of no military use since the company was established."

Class Action Complaint for Violation of the Federal Securities Laws

68.     On this news, SMIC's ADR price fell $3.08 per ADR, or over 20%, to close at $12.02 per ADR on September 8, 2020, the next trading day. [2]

69.     On September 26, 2020, *Reuters* published an article entitled "U.S. tightens exports to China's chipmaker SMIC, citing risk of military use" which announced the following, in pertinent part:

> The United States has imposed restrictions on exports to China's biggest chip maker SMIC after concluding there is an "unacceptable risk" equipment supplied to it could be used for military purposes.
>
> Suppliers of certain equipment to Semiconductor Manufacturing International Corporation 0981.HK will now have to apply for individual export licenses, according to a letter from the Commerce Department dated Friday and seen by Reuters.

70.     On this news, SMIC's ADR price fell $0.57 per ADR, or 4.7%, to close at $11.47 per ADR on September 28, 2020, the next trading day.

71.     In response to this news, the board of SMIC issued the following statement on September 28, 2020:

> Semiconductor Manufacturing International Corporation (the "Company" or "SMIC") noted that a document suspected to have been issued by the Bureau of Industry and Security of the United States Department of Commerce was sent to the Company by media asking for confirmation or forwarded online on Saturday, 26 September 2020. According to the document, some products exported to SMIC, its subsidiaries and joint ventures will be subject to export control.
>
> As of the date of this announcement, the Company has not received such official information. SMIC reiterates that it manufactures semiconductors and provides services solely for civilian and commercial end-users and end-uses. The Company has no relationship with the

---

[2] September 8 was the next trading day because September 5 and 6 were a Saturday and Sunday, and September 7 was Labor Day.

Class Action Complaint for Violation of the Federal Securities Laws

Chinese military and does not manufacture for any military end-users or end-uses.

72.    On November 29, 2020, Reuters reported, in an article titled "EXCLUSIVE-Trump to add China's SMIC and CNOOC to defense blacklist - sources", that

> The Trump administration is poised to add China's top chipmaker SMIC and national offshore oil and gas producer CNOOC to a blacklist of alleged Chinese military companies, according to a document and sources, curbing their access to U.S. investors and escalating tensions with Beijing weeks before President-elect Joe Biden takes office.

> Reuters reported earlier this month that the Department of Defense was planning to designate four more Chinese companies as owned or controlled by the Chinese military, bringing the number of Chinese companies affected to 35.

> It was not immediately clear when the new tranche, would be published in the Federal Register. But the list comprises China Construction Technology Co Ltd and China International Engineering Consulting Corp, in addition to Semiconductor Manufacturing International Corp (SMIC) and China National Offshore Oil Corp (CNOOC), according to the document and three sources.

73.    On December 3, 2020, Reuters reported, in an article titled "United States adds China's SMIC and CNOOC to Defense blacklist", that:

> The Trump administration on Thursday added China's top chipmaker, SMIC, and oil giant CNOOC to a blacklist of alleged Chinese military companies, drawing condemnation from Beijing as President-elect Joe Biden prepares to take office.

> The Department of Defense designated a total of four additional companies as owned or controlled by the Chinese military, including China Construction Technology Co Ltd and China International Engineering Consulting Corp.

> The move, first reported by Reuters on Sunday, takes to 35 the total number of blacklisted companies. While the list did not initially trigger any penalties, a recent executive order by Republican President Donald

- 29 -

Trump will prevent U.S. investors from buying the firms' securities from late next year.

In Beijing, a foreign ministry spokeswoman said China opposed U.S. efforts to suppress its companies, adding that Washington's moves run counter to principles of market competition.

"The U.S. should stop abusing national power and national security concepts to suppress foreign companies," Hua Chunying told a regular news briefing on Friday.

In a stock market statement, SMIC said it strongly opposed the decision, which reflected a fundamental misunderstanding by the U.S. administration of the end-uses of its business and technology.

The company also said there was no major impact from its addition to the list. Its Hong Kong shares closed Friday down 5.4% after having resumed trading in the afternoon following a suspension.

CNOOC, formally known as China National Offshore Oil Corp, said it was "shocked and regretful" at being added to the list. The move was based on "false and inaccurate information", it said in a statement on its website.

In and exchange filing, the state-owned company's listed arm, CNOOC Ltd, said it was assessing the impact of the situation on the group and would closely monitor developments.

Shares of CNOOC Ltd had fallen nearly 14% percent after Sunday's report, and tumbled 3.9% by Friday's market close.

SMIC, which relies heavily on equipment from U.S. suppliers, was already in Washington's crosshairs.

In September, the U.S. Commerce Department informed some firms they needed to obtain a license before supplying goods and services to SMIC after concluding there was an "unacceptable risk" that equipment supplied to it could be used for military purposes.

The expanded blacklist is seen as part of a bid to cement Trump's tough-on-China legacy and to box Biden, the Democratic president-elect who

- 30 -

Class Action Complaint for Violation of the Federal Securities Laws

takes office on Jan. 20, into hardline positions on Beijing amid bipartisan anti-China sentiment in Congress.

The measure is also part of a broader effort by Washington to target what it sees as Beijing's efforts to enlist corporations to harness emerging civilian technologies for military purposes.

The list of "Communist Chinese Military Companies" was mandated by a 1999 law requiring the Pentagon to compile a catalog of companies "owned or controlled" by the People's Liberation Army, but the DOD only compiled it in 2020.

Giants like Hikvision, China Telecom and China Mobile were added this year.

In November, the White House published an executive order, first reported by Reuters, that sought to give teeth to the list by barring U.S. investors from buying securities of the firms, from November 2021.

Top U.S. asset managers Vanguard Group and BlackRock Inc each own about 1% of shares of CNOOC's listed unit CNOOC Ltd, and together own roughly 4% of outstanding shares of SMIC, disclosures show.

Congress and the Trump administration have sought increasingly to curb the U.S. market access of Chinese companies that do not comply with rules faced by American rivals, even if that means antagonizing Wall Street.

On Wednesday, the U.S. House of Representatives passed a law to kick Chinese companies off U.S. stock exchanges if they do not fully comply with the country's auditing rules, giving Trump one more tool to threaten Beijing with before leaving office.

74.    On December 18, 2020, the US Bureau of Industry and Security issued a ruling placing SMIC on the Entities List. The Bureau stated:

The ERC [End-User Review Committee] determined that the seventy-seven subject entities are engaging in or enabling activities contrary to U.S. national security and foreign policy interests, as follows:

Class Action Complaint for Violation of the Federal Securities Laws

Semiconductor Manufacturing International Corporation Incorporated (SMIC) is added to the Entity List as a result of China's military-civil fusion (MCF) doctrine and evidence of activities between SMIC and entities of concern in the Chinese military industrial complex. The Entity List designation limits SMIC's ability to acquire certain U.S. technology by requiring exporters, reexporters, and in-country transferors of such technology to apply for a license to sell to the company.

75.   At the same time, the Bureau placed numerous other entities on the Entities List, including Beijing Institute of Technology and Nanjing University of Aeronautics and Astronautics, "for acquiring and attempting to acquire U.S.-origin items in support of programs for the People's Liberation Army. This activity is contrary to national security and foreign policy interests under section 744.11(b) of the EAR." As set forth above, Beijing Institute of Technology and Nanjing University of Aeronautics and Astronautics both used SMIC chip designs.

76.   On December 22, 2020, Representative Michael McCaul and Senator Marco Rubio issued a letter to then-Secretary of Commerce Wilbur Ross urging harsher sanctions on SMIC. McCaul was the Lead Republican on the House Foreign Affairs Committee and Chairman of the China Task Force. Rubio was Co-Chair of the bipartisan and bicameral Congressional-Executive Commission on China (CECC), the Chairman of the Senate Foreign Relations' Subcommittee that oversees human rights, and is a member of the Subcommittee on East Asia, the Pacific, and International Cybersecurity Policy. As a result of their positions, McCaul and Rubio receive detailed, classified intelligence regarding national security threats from the PRC. The letter stated:

SMIC is a clear threat to U.S. national security, because of its integration into the defense establishment of the PRC and its national strategy for military-civil fusion. These linkages are well-documented by both the Department of Defense, which identified SMIC as a Chinese Communist Party (CCP) military company earlier this month, and private sector researchers at SOS International LLC. It is in the U.S. national security interest to prohibit the transfer of goods that might support SMIC's production of semiconductors, because of the company's role in helping

- 32 -

Class Action Complaint for Violation of the Federal Securities Laws

the CCP military's pursuit of "[displacing] the United States to achieve global preeminence in the future."

77.     On June 3, 2021, President Joseph R. Biden issued "Addressing the Threat From Securities Investments That Finance Certain Companies of the People's Republic of China". That order refined the list of companies in which it is forbidden for US Persons to transact in their securities. Rather than applying the statutory definition of Communist Chinese Military Companies, Biden's executive order forbade US transactions in securities in designated entities that the Department of Treasury determined "(i) to operate or have operated in the defense and related materiel sector or the surveillance technology sector of the economy of the PRC; or (ii) to own or control, or to be owned or controlled by, directly or indirectly, a person who operates or has operated in any sector described in subsection (a)(i) of this section, or a person who is listed in the Annex to this order or who has otherwise been determined to be subject to the prohibitions in subsection (a) of this section." A White House Fact Sheet regarding the order listed SMIC as being subject to the Executive Order under the category of "Defense and Related Materiel Sector of the Economy of the PRC."

78.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**Additional Allegations Supporting Scienter**

79.     Zhou's former senior position at MIIT creates a strong inference of scienter. As set forth above, MIIT is heavily tied into the PRC's defense and intelligence activities. MIIT oversees several military affiliated universities (including several tied to use of SMIC's products), implements domestic surveillance programs, and oversees the Chinese Communist Party's doctrine of Civil-Military Fusion. This placed Zhou in a position to directly be aware of the PRC military and intelligence community's collaboration with SMIC.

Class Action Complaint for Violation of the Federal Securities Laws

80.     Further supporting the inference of scienter is the fact that Zhou gave a tour of SMIC facilities to Ma Kai, the Vice Premier of the PRC and a member of the Politburo Miao Ke, the head of MIIT, Ding Xuedong, the chairman and CEO of China's sovereign wealth fund China Investment Corporation, and the Deputy Mayor of Beijing Yin Hejun. This meeting provides evidence of direct ties between the Chairman of SMIC and senior figures within the PRC government and Communist Party, including the head of MIIT.

81.     Further supporting the inference of scienter is the fact that Zhou caused SMIC to issue false exculpatory statements on September 5 and 28.

82.     Further supporting the inference of Zhou's scienter is the fact that SMIC deliberately withdrew from the VEU program, thus terminating US authority to inspect SMIC facilities in China.

83.     Further supporting the inference of Zhou's scienter is the fact that Chinese state owned or controlled entities own 32.76% of SMIC's stock. According to SMIC's 2019 Annual Report, as of December 31, 2019, Datang Telecom Technology & Industry Holdings owns 17% of SMIC's stock, and China Integrated Circuit Industry Investment Fund Co., Ltd owns 19.38% of SMIC's stock. According to a Reuters article titled "China's SMIC sells $172 mln shares to Datang Telecom", Datang Telecom is an indirect subsidiary of China's State Development and Investment Corp. According to Crunchbase, China Integrated Circuit Industry Investment Fund Co. is a state-owned investment fund. The fact that state owned entities own a substantial portion of SMIC's stock creates a motive for Zhou to serve the interests of the Chinese state.

84.     Further supporting Zhou's scienter is the fact that the Shanghai Government and MIIT removed articles from their websites showing evidence of meetings between Chinese government personnel and executives of SMIC.

85.     Further supporting Zhou's scienter is the fact that, as set forth in Executive Order No. 13959, SMIC was motivated to "exploit[] United States

Class Action Complaint for Violation of the Federal Securities Laws

investors to finance the development and modernization of [the Chinese] military" by selling stock in the United States while secretly working for the Chinese military as part of the Military-Civil Fusion doctrine.

86.    Supporting the inference of Zhao's scienter is the fact that Zhao issued a companywide policy, for review by all employees, that was purportedly designed to prevent violation of export controls.

87.    Further supporting the inference of Zhao's scienter is the fact that Chinese state owned or controlled entities own 32.76% of SMIC's stock. According to SMIC's 2019 Annual Report, as of December 31, 2019, Datang Telecom Technology & Industry Holdings owns 17% of SMIC's stock, and China Integrated Circuit Industry Investment Fund Co., Ltd owns 19.38% of SMIC's stock. According to a Reuters article titled "China's SMIC sells $172 mln shares to Datang Telecom", Datang Telecom is an indirect subsidiary of China's State Development and Investment Corp. According to Crunchbase, China Integrated Circuit Industry Investment Fund Co. is a state-owned investment fund. The fact that state owned entities own a substantial portion of SMIC's stock creates a motive for Zhao to serve the interests of the Chinese state.

88.    Further supporting Zhao's scienter is the fact that the Shanghai Government and MIIT removed articles from their websites showing evidence of meetings between Chinese government personnel and executives of SMIC.

89.    Further supporting Zhao's scienter is the fact that, as set forth in Executive Order No. 13959, SMIC was motivated to "exploit[] United States investors to finance the development and modernization of [the Chinese] military" by selling stock in the United States while secretly working for the Chinese military as part of the Military-Civil Fusion doctrine.

90.    Further supporting the inference of Liang's scienter is the fact that Zhao caused SMIC to issue false exculpatory statements on September 5 and 28.

91.     Further supporting the inference of Liang's scienter is the fact that SMIC deliberately withdrew from the VEU program, thus terminating US authority to inspect SMIC facilities in China.

92.     Supporting the inference of Liang's scienter is the fact that Liang's issued a companywide policy, for review by all employees, that was purportedly designed to prevent violation of export controls.

93.     Further supporting the inference of Liang's scienter is the fact that Liang caused SMIC to issue false exculpatory statements on September 5 and 28.

94.     Further supporting the inference of Liang's scienter is the fact that SMIC deliberately withdrew from the VEU program, thus terminating US authority to inspect SMIC facilities in China.

95.     Further supporting the inference of Liang's scienter is the fact that Chinese state owned or controlled entities own 32.76% of SMIC's stock. According to SMIC's 2019 Annual Report, as of December 31, 2019, Datang Telecom Technology & Industry Holdings owns 17% of SMIC's stock, and China Integrated Circuit Industry Investment Fund Co., Ltd owns 19.38% of SMIC's stock. According to a Reuters article titled "China's SMIC sells $172 mln shares to Datang Telecom", Datang Telecom is an indirect subsidiary of China's State Development and Investment Corp. According to Crunchbase, China Integrated Circuit Industry Investment Fund Co. is a state-owned investment fund. The fact that state owned entities own a substantial portion of SMIC's stock creates a motive for Liang to serve the interests of the Chinese state.

96.     Further supporting Liang's scienter is the fact that the Shanghai Government and MIIT removed articles from their websites showing evidence of meetings between Chinese government personnel and executives of SMIC.

97.     Further supporting Liang's scienter is the fact that, as set forth in Executive Order No. 13959, SMIC was motivated to "exploit[] United States investors to finance the development and modernization of [the Chinese] military" by

selling stock in the United States while secretly working for the Chinese military as part of the Military-Civil Fusion doctrine.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

98. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired SMIC securities publicly traded on the OTCQX market during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of SMIC and its subsidiaries, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

99. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SMIC securities were actively traded on the OTCQX market. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

100. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

101. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

102. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

Class Action Complaint for Violation of the Federal Securities Laws

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Individual Defendants caused the Company to issue false and misleading public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements during the Class Period;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

103.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

104.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

Class Action Complaint for Violation of the Federal Securities Laws

| | |
|---|---|
| 1 | •   the omissions and misrepresentations were material; |
| 2 | •   the Company's securities are traded in efficient markets; |
| 3 | •   the Company's securities were liquid and traded with moderate to heavy |
| 4 | volume during the Class Period; |
| 5 | •   the Company's securities traded on the OTCQX market, and was |
| 6 | covered by at least 11 analysts and multiple market makers; |
| 7 | •   the company's common stock, to which the price of the company's |
| 8 | ADRs was directly linked, traded with heavy volume, with 3.5% of the |
| 9 | company's float trading daily on average. |
| 10 | •   the misrepresentations and omissions alleged would tend to induce a |
| 11 | reasonable investor to misjudge the value of the Company's securities; |
| 12 | and |
| 13 | •   Plaintiff and members of the Class purchased and/or sold the Company's |
| 14 | securities between the time the Defendants failed to disclose or |
| 15 | misrepresented material facts and the time the true facts were disclosed, |
| 16 | without knowledge of the omitted or misrepresented facts. |

105.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

106.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **COUNT I**

### **Violation of Section 10(b) of The Exchange Act and Rule 10b-5**

### **Against All Defendants**

- 39 -

107.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

108.   This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

109.   During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

110.   The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

111.   The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true

facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

112.   Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

113.   As a result of the foregoing, the market price of the Company's securities were artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

114.   Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

115.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

116.   By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder

and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

117.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

118.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

119.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

120.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

121. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

122. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

### **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Class Action Complaint for Violation of the Federal Securities Laws

Dated: January 7, 2022

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Jonathan Stern
Jonathan Stern (*pro hac vice*)
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com
Email:jstern@rosenlegal.com

*Counsel for Plaintiff*

- 44 -