John E. Schreiber (SBN: 261558)
jschreiber@winston.com
Aaron C. O'Dell (SBN: 281851)
acodell@winston.com
Lara Markarian (SBN: 327345)
lmarkarian@winston.com
**WINSTON & STRAWN LLP**
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone:   (213) 615-1700
Facsimile:    (213) 615-1750

*Attorneys for Defendant*
SEMICONDUCTOR MANUFACTURING
INTERNATIONAL CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Semiconductor Manufacturing International Corporation Securities Litigation | **Case No. 2:20-cv-11219-GW-AFM** |
| | Assigned to Hon. George H. Wu |
| | **DEFENDANT SEMICONDUCTOR MANUFACTURING INTERNATIONAL CORPORATION'S MOTION TO DISMISS SECOND CONSOLIDATED AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | [*Filed concurrently with Declaration of John E. Schreiber, Request for Judicial Notice, and Proposed Order*] |
| | Date:           June 9, 2022 |
| | Time:           8:30 a.m. |
| | Courtroom:   9D – First Street Courthouse |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on June 9, 2022, at 8:30 a.m., or as soon thereafter as counsel may be heard, before the Honorable George H. Wu, in Courtroom 9D, 9th floor, of the United States Courthouse, 350 West 1st Street, Los Angeles, California, Defendant Semiconductor Manufacturing International Corporation ("SMIC") will move, and hereby does move, for dismissal of this action, with prejudice, pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. This Motion is based on the following Memorandum of Points and Authorities, the concurrently filed Declaration and Request for Judicial Notice, the evidence and records on file in this action, and any other written or oral evidence or argument that may be presented at or before the time this Motion is heard by the Court.

Dated:  February 25, 2022

Respectfully submitted,

**WINSTON & STRAWN LLP**

By:*/s/ John E. Schreiber*
    John E. Schreiber
    Aaron C. O'Dell
    Lara Markarian

*Attorneys for Defendant*
SEMICONDUCTOR MANUFACTURING
INTERNATIONAL CORPORATION

1

# **TABLE OF CONTENTS**

2  MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

3  I.  PRELIMINARY STATEMENT ......................................................................... 1

4  II.  BACKGROUND AND PROCEDURAL HISTORY ........................................ 2

5      A.  The Parties ............................................................................................. 3

6      B.  The Dismissal of the CAC ................................................................... 4

7      C.  The SAC ................................................................................................ 6

8  III.  LEGAL STANDARD ..................................................................................... 6

9  IV.  PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(B)............. 7

10      A.  The SAC Fails to Plead Loss Causation .............................................. 8

11      B.  Plaintiff Again Fails to Adequately Allege Scienter .............................. 10

12          1.  The SAC Fails to Adequately Allege That Defendants Had a Financial Incentive to Artificially Inflate the Price of SMIC
13               ADRs ........................................................................................... 11

14          2.  The U.S. Government Never Confirmed the Accuracy of the SOS Report ............................................................................... 12

15          3.  The SAC's Other Scienter Allegations Are Unavailing ............... 15

16      C.  The SAC Fails to Plead an Actionable Misstatement or Omission ........ 18

17

18          1.  The SAC (like the CAC) Fails to Plead Securities Fraud Based on SMIC's Statements of Legal Compliance .................... 19

19          2.  SMIC's Optimistic Statements Concerning the "Strength" of Its Relationships with Suppliers and Its "Confidence in the
20               Future" Are Inactionable Even on an Omission-Based
21               Theory ........................................................................................ 21

22          3.  Plaintiff Fails to Adequately Plead That SMIC Manufactured Products for Military End Use ...................................................... 23

23  V.  CONCLUSION ............................................................................................. 24

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abuhamdan v. Blyth, Inc.*,
  9 F. Supp. 3d 175 (D. Conn. 2014) ....................................................................22

*In re Almost Fam., Inc. Sec. Litig.*,
  2012 WL 443461 (W.D. Ky. Feb. 10, 2012) ........................................................9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..............................................................................................6

*Brown v. Ambow Educ. Holding Ltd.*,
  2014 WL 523166 (C.D. Cal. 2014) ..........................................................8, 9, 10

*In re China Educ. All., Inc., Sec. Litig.*,
  2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) .....................................................14

*City of Royal Oak Ret. Sys. v. Juniper Networks*,
  880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..............................................................21

*Curry v. Yelp Inc.*,
  875 F.3d 1219 (9th Cir. 2017) ...............................................................................9

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ...............................................................................8

*In re Downey Sec. Litig.*,
  2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ..............................................12, 14

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005) ..............................................................................................8

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) .............................................................................11

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) ............................................................................................11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ............................................................................................24

*Ikeda v. Baidu, Inc.*,
   2021 WL 1299046 (N.D. Cal. Apr. 7, 2021) ........................................................19

*Karam v. Corinthian Colls., Inc.*,
   2012 WL 8499135 (C.D. Cal. Aug. 20, 2012) .......................................................18

*Lloyd v. CVB Fin. Corp.*,
   2012 WL 12883517 (C.D. Cal. Aug. 21, 2012) .....................................................10

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014), (as amended Sept. 11, 2014) ..............................9, 10

*In re Maxim Pharms., Inc. Sec. Litig.*,
   2005 WL 8179524 (S.D. Cal. 2005) ......................................................................17

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
   2021 WL 1199035 (S.D.N.Y. 2021) .....................................................................20

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ............................................................................9, 18

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ...............................................................................6, 11

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
   951 F. Supp. 2d 479 (S.D.N.Y. 2013) ..................................................................8, 10

*Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*,
   96 F.3d 1151 (9th Cir. 1996) .................................................................................24

*In re PharmaCielo Ltd. Sec. Litig.*,
   2021 WL 4459756 (C.D. Cal. Apr. 16, 2021) ......................................................22

*Plumley v. Sempra Energy*,
   2017 WL 2712297 (S.D. Cal. June 20, 2017) .......................................................22

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-
   Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) ...............................................................................21

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ...................................................................................7

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ..................................................................................11

*In re Silvercorp Metals, Inc. Sec. Litig.*,
  26 F. Supp. 3d 266 (S.D.N.Y. 2014) ...............................................................14, 15

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
  552 U.S. 148 (2008) ..............................................................................................7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ......................................................................................*passim*

*In re Under Armour Sec. Litig.*,
  409 F. Supp. 3d 446 (D. Md. 2019) ........................................................................15

*United States v. United Health. Ins. Co.*,
  848 F.3d 1161 (9th Cir. 2016) .................................................................................6

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019) ..............................................................21, 22

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) .................................................................................12

*In re Verifone Sec. Litig.*,
  2016 WL 1213666 (N.D. Cal. Mar. 29, 2016) .........................................................22

*Villare v. Abiomed, Inc.*,
  2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) ........................................................22

*Webb v. Solarcity Corp.*,
  884 F.3d 844 (9th Cir. 2018) .................................................................................12

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) .............................................................................7, 18

**Statutes**

15 U.S.C. § 78u-4(b) ....................................................................................7, 8, 11

Private Securities Litigation Reform Act ("PSLRA") .......................................*passim*

Securities Exchange Act of 1934 §10(b) and SEC Rule 10b-5 ..........................*passim*

Securities Exchange Act of 1934 § 20(a) ...............................................................24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Other Authorities**

15 C.F.R. 744.21.......................................................................................20

Fed. R. Civ. P. 9(b)..................................................................................1, 6

Fed. R. Civ. P. 12(b)(6).................................................................................6

SMIC'S MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 2:20-cv-11219-GW-AFM

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Semiconductor Manufacturing International Corporation ("SMIC") respectfully submits this Memorandum of Points and Authorities in support of its motion to dismiss the Second Amended Complaint (Docket No. 54, "SAC") with prejudice.[1]

## I.   PRELIMINARY STATEMENT

Last fall, this Court granted SMIC's motion to dismiss Plaintiff's first Consolidated Amended Complaint ("CAC") in this action, finding that it failed to adequately allege a violation of Section 10(b) of the Securities Exchange Act of 1934 under the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 9(b).  Docket No. 47 ("Prior Ruling").  In so doing, the Court pointedly observed that "this is a securities fraud case, not an international trade or national security matter" and, as such, Plaintiff is required to plead particularized facts demonstrating, among other things, that SMIC intended to "deceive or defraud [its own] *investors*" and/or otherwise engaged in conduct that "present[ed] a danger of misleading *buyers or sellers*" of its securities.  *Id.* at 17 (citations omitted).  Concluding that the CAC fell well short of that mark, the Court found that it failed to plead a strong inference of scienter, which in and of itself required dismissal.  *Id.*

As an alternative basis for dismissal, the Court also found that the CAC failed to adequately plead (a) the separate element of loss causation, as neither of the two alleged "corrective disclosures" identified by Plaintiff "'revealed' any 'truth' … contradicting a prior misstatement" (*id.* at 17-18), or (b) falsity with respect to SMIC's statements concerning its compliance with applicable laws, as Plaintiff failed to "identify any United States law or export control regulation that SMIC was not complying with at the

---

[1] The SAC also purports to assert claims against Zixue Zhou, Hai Jun Zhao, and Mong Song Liang (the "Individual Defendants").  SAC ¶¶ 15-19.  The Individual Defendants have not been served with the SAC (nor were they served with any prior complaint in this action).  Thus, this Motion is brought solely on SMIC's behalf.

1  time the [alleged misstatements] were made" (*id.* at 12-13).

2      As demonstrated below, Plaintiff's newly filed SAC does not cure any – *let alone*

3  *all* – of these deficiencies.  Accordingly, for the reasons set forth herein, the SAC should

4  be dismissed in its entirety, with prejudice.

5  **II.    BACKGROUND AND PROCEDURAL HISTORY**

6      The trade war between the United States and China, which escalated during the

7  Trump administration, remains ongoing.  As the SAC acknowledges, numerous actions

8  taken by the outgoing administration to penalize and encumber Chinese companies

9  were "seen as part of a bid to cement Trump's tough-on-China legacy and to box Biden

10 … into hardline positions on Beijing amid bipartisan anti-China sentiment in Congress."

11 SAC ¶ 73 (quoting Dec. 3, 2020 *Reuters* report).  Such actions included having the

12 Commerce Department's Bureau of Industry and Security ("BIS") place hundreds of

13 Chinese companies on a so-called "Entity List" – based on purported "foreign policy"

14 and/or "national security" risks – thereby requiring U.S. suppliers to secure licenses in

15 order to continue to export certain items to such companies.  *Id.* ¶¶ 25-26, 74-75.[2]

16     As has been widely reported, the Trump administration was seen as having

17 "weaponized the so-called [E]ntity [L]ist," using it "aggressively," "erratically," and

18 "haphazardly" to "hit key Chinese industries" "and starve [them] of components."[3]

19 Defendant SMIC – one of the world's leading manufacturers of semiconductors for

20 commercial applications – is one of many Chinese companies that has been caught in

21 the crosshairs.[4]  On December 18, 2020 – *three months after the putative class period*

22

23 [2] *See also* Ex. A ("Exclusive: Trump administration weighs blacklisting China's

24 chipmaker SMIC," *Reuters*, Sept. 4, 2020); Ex. B ("U.S. Weighs Export Controls on China's Top Chip Maker," *Wall Street Journal*, Sept. 6, 2020).  References to "Ex." are

25 to the exhibits attached to the Declaration of John E. Schreiber filed concurrently herewith.

26 [3] *See* Exs. A, B; *see also* Ex. C ("To Sway the U.S. Tech Fight With China, Insiders Tap

27 an Obscure Agency – Gauging How Hard To Squeeze Beijing," *New York Times*, Mar. 28, 2021, at A21).

28 [4] Ex. D ("4 Things to Know About TSMC's Growing Chinese Semiconductor Rival," *Nasdaq*, Aug. 5, 2020) ("This makes SMIC a crucial player in the escalating tech war

*in this case ended* – the outgoing Trump administration ultimately added SMIC, along with *seventy-six* other Chinese companies, to the growing Entity List. *Id.* ¶ 74. In so doing, however, the Trump administration did not assert that SMIC had violated any laws or that it in fact manufactured and supplied products for military end use. *See id.* Rather, it merely cited unspecified "activities between SMIC and entities of concern in the Chinese military industrial complex" as the basis for its decision. *Id.* Nor did SMIC's being placed on the Entity List prohibit U.S. suppliers from exporting items to the Company; on the contrary, as noted above, it merely required U.S. suppliers to apply for and obtain an export license in order to do so. *Id.* ¶ 26. And, in fact, as reflected in publicly available data published by the U.S. Government itself, as of April 2021, months after SMIC's addition to the Entity List, BIS had already granted 188 supplier license applications (over 91% of those submitted) to export components to SMIC, thus undercutting the notion that the U.S. Government believed that SMIC was violating U.S. export laws.[5]

### A.    The Parties

SMIC is a publicly traded corporation, headquartered in Shanghai, China, that manufactures semiconductors and provides services solely for civilian and commercial end users and end uses. *Id.* ¶¶ 14, 65. It does not manufacture semiconductors for, or provide services to, the Chinese military. *Id.* ¶ 65. The Company maintains offices throughout the world, including China, Japan, Italy, Taiwan, and the United States. Founded in 2000 by a veteran of U.S. and Taiwanese chip companies, SMIC has grown to become one of the world's leading manufacturers of semiconductors and was, at one time, a major producer for North American companies. *See* Ex. B. It has long

---

between the U.S. and China, wherein both countries are curbing their dependence on the other's technologies due to national security and trade concerns."); Ex. E ("The Latest U.S. Blow to China's Huawei Could Knock Out Its Global 5G Plans," *NPR*, May 28, 2020) ("The U.S. government has decided to sort of weaponize this U.S. technology dominance in semiconductor manufacturing[.]").

[5] *See* Ex. F (Export Control Licensing Decisions for SMIC, Nov. 9, 2020 – Apr. 20, 2021, U.S. House Committee on Foreign Affairs website).

maintained strategic partnerships with multiple U.S.-based semiconductor equipment suppliers, and prior to the Trump administration, SMIC had never been accused by the U.S. Government of posing any security risk to the United States.  *See* SAC ¶ 65.

SMIC's shares are listed on the Hong Kong Stock Exchange ("HKEX") and the Science and Technology Innovation Board ("STAR Market") of the Shanghai Stock Exchange.  *Id.*  During the putative class period, SMIC American depository receipts ("ADRs") also traded over the counter in the United States on the OTCQX exchange. *Id.* ¶ 14.

Plaintiff Edward Edmond K. L. To alleges that he purchased 13,040 SMIC ADRs between July 20 and September 21, 2020, and suffered losses when news outlets reported in September 2020 that the Trump administration was considering adding SMIC to the Entity List.  Docket No. 12, Ex. 3 ("Loss Chart"); SAC ¶ 10.[6]  Oddly, in light of his allegations in this case, Mr. To continued to purchase even *more* SMIC ADRs on three separate occasions following the first of these so-called corrective disclosures on September 6, 2020.  SAC ¶ 10.  He seeks to represent a putative class consisting of all purchasers of SMIC ADRs between the dates of April 23 and September 26, 2020.  *Id.* ¶ 1.

**B.    The Dismissal of the CAC**

Plaintiff filed the CAC on May 21, 2021, asserting that SMIC violated Section 10(b) of the Exchange Act, and SEC Rule 10b-5 thereunder, by making various alleged misstatements and omissions purportedly designed to deceive investors in SMIC securities.  Specifically, the CAC alleged that during the class period, SMIC deliberately misled investors concerning whether the Company manufactured and supplied semiconductors for military end use and whether it complied with U.S. export

---

[6] In both the CAC and now the SAC, Plaintiff purports to add Patrick McCormick and Maurice O'Keefe as "additional plaintiffs," though neither was appointed – or even moved to be appointed – by the Court pursuant to the PSLRA.  SAC ¶¶ 11-12.  Plaintiff has failed – despite the Court's express direction (Prior Ruling fn.1) – to provide any basis for adding Messrs. McCormick and O'Keefe as parties to this action.

laws.  CAC ¶¶ 49, 51, 53, 55, 58.  The CAC alleged that the "truth" underlying these alleged misstatements and omissions was thereafter "revealed" to investors through two "corrective disclosures."  *Id.* ¶¶ 10, 59-63.

The first of these was a September 6, 2020 *Wall Street Journal* ("*WSJ*") article (Ex. B) that reported that "[t]he Trump Administration is weighing whether" to add SMIC to the Entity List.  SAC ¶ 67.[7]  While the article referenced allegations by a hawkish defense contractor – James Mulvenon of SOS International (the "SOS report") – that "SMIC aids China's defense establishment," it also noted that a global technology policy expert "who had reviewed the SOS report, described the military links it alleged as tenuous" and observed that the SOS report "doesn't allege that SMIC sells chips directly to the Chinese military."  Ex. B.  The article further explained:

> The Trump administration has taken an increasingly broad approach to its use of the [E]ntity [L]ist.  Though listings have been used traditionally against companies violating export-control rules, administration officials have increasingly justified listings on broader national-security grounds.  Chinese companies have become frequent targets.

*Id.*  The second purported "corrective disclosure" was a September 26, 2020 *Reuters* article (Ex. G)[8] reporting that the Commerce Department had sent a letter to "[s]uppliers of certain equipment to [SMIC]," advising them that they "will now have to apply for individual export licenses" in order to continue to do so based on a "risk" that equipment supplied to SMIC could be used for military purposes.  SAC ¶ 69.  It was not until December 18, 2020 – *nearly three months after the putative class period ended* – that the outgoing Trump administration actually added SMIC (along with scores of other Chinese companies) to the Entity List.  *Id.* ¶¶ 74-75.

On July 20, 2021, SMIC moved to dismiss the CAC on the grounds that Plaintiff

---

[7] The SAC incorrectly identifies the September 6, 2020 *WSJ* article as being published by CNBC.  SAC ¶ 67.

[8] Ex. G ("U.S. tightens exports to China's chipmaker SMIC, citing risk of military use," *Reuters*, Sept. 26, 2020).

failed to adequately allege at least three critical elements of a 10b-5 claim – (i) any actionable misstatement or omission, (ii) a strong inference of scienter, or (iii) loss causation – the lack of any of which, standing alone, required dismissal.  Docket No. 43. This Court agreed, finding that "there are problems with each of the three elements [SMIC] has targeted."  Prior Ruling at 18.  Specifically, in its Prior Ruling (a tentative ruling that was confirmed on November 18, 2021), this Court found that the CAC failed to adequately plead (i) a strong inference of scienter, (ii) loss causation, or (iii) falsity with respect to SMIC's statements concerning legal compliance.  *Id.* at 12-13, 15-18. Accordingly, the Court granted SMIC's Motion to Dismiss, though it allowed Plaintiff leave to amend.  *Id.* at 18.

### C.    The SAC

On January 7, 2022, Plaintiff filed the SAC, in which he asserts the same cause of action against SMIC – for violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder – based on the exact same (i) theory of liability, (ii) two purported "corrective disclosures," and (iii) putative class period.  Docket No. 54. Virtually all the new "facts" alleged in the SAC relate to events that took place *after* the putative class period ended and thus are of no relevance to Plaintiff's claim in this case. For the reasons discussed below, the SAC should be dismissed, with prejudice.

## III.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the factual allegations in a complaint must "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  Securities fraud complaints are subject to even stricter pleading standards. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020).  Rule 9(b) requires that "[i]n alleging fraud … a party must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  "This means the plaintiff must allege 'the who, what, when, where, and how of the misconduct charged,' including what is false or misleading about a statement, and why it is false." *United States v. United Health.*

6

1  *Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (citations omitted).

2         Another source of these heightened pleading requirements is the PSLRA, which

3  states that a complaint must, among other things, "specify each statement alleged to

4  have been misleading [and] the reason or reasons why the statement is misleading" and

5  "state with particularity facts giving rise to a strong inference that the defendant acted

6  with … a mental state embracing intent to deceive, manipulate, or defraud." 15 U.S.C.

7  § 78u-4(b)(1) to (2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319,

8  321 (2007). As the Ninth Circuit has observed, "[i]n few other areas are motions to

9  dismiss for failure to state a claim upon which relief can be granted so powerful."

10  *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001).

11  **IV.   PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(B)**

12         To state a claim for securities fraud under Section 10(b) of the Exchange Act and

13  Rule 10b-5 promulgated thereunder, a plaintiff must plead particularized facts

14  demonstrating (1) a material misrepresentation or omission by the defendant,

15  (2) scienter, (3) a connection between the misrepresentation or omission and the

16  purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.

17  *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

18         As set forth in Section IV.C below, SMIC maintains that the SAC fails to

19  adequately allege any threshold material misstatement or omission. But even if it did,

20  Plaintiff's Section 10b-5 claim would still be subject to dismissal for failure to

21  (A) identify a "corrective disclosure" during the class period that "revealed" the

22  "'truth' … contradicting a prior misstatement" (Prior Ruling at 17-18) or (B) "state

23  with particularity facts giving rise to a *strong* inference" that SMIC acted with an intent

24  to "deceive or defraud" its own investors (*id.* at 8-9, 15-17). This provides two separate

25  and independent bases on which to dismiss the SAC, with prejudice, even assuming,

26  *arguendo*, that Plaintiff adequately pleaded any threshold material misstatement or

27  omission (which he has not). *See, e.g.*, *Zucco Partners, LLC v. Digimarc Corp.*,

28  552 F.3d 981, 1007 (9th Cir. 2009) (affirming dismissal with prejudice of second

1   amended 10b-5 complaint for failure to cure deficiencies in prior complaint).

2   **A.    The SAC Fails to Plead Loss Causation**

3   As the Supreme Court held in *Dura Pharmaceuticals, Inc. v. Broudo*, the PSLRA

4   "expressly imposes on plaintiffs 'the burden of proving' that the defendant's

5   misrepresentations 'caused the loss for which the plaintiff seeks to recover.'"  544 U.S.

6   336, 345-46 (2005) (quoting 15 U.S.C. § 78u-4(b)(4)); *see also In re Daou Sys., Inc.*,

7   411 F.3d 1006, 1025 (9th Cir. 2005).  To satisfy this requirement, a plaintiff must allege

8   that the "facts" underlying a purported misrepresentation were subsequently revealed

9   to the market during the class period – i.e., that there was a "corrective disclosure" –

10  and that this revelation caused a drop in the stock price.  *See Dura*, 544 U.S. at 347;

11  *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *5 (C.D. Cal. 2014).  In other

12  words, the plaintiff must plead that "the defendant's misrepresentation (or other

13  fraudulent conduct) proximately caused the plaintiff's economic loss."  *Dura*, 544 U.S.

14  at 346.

15  "[A] decline in stock price following a public announcement of 'bad news' does

16  not, without more, demonstrate loss causation."  *Okla. Firefighters Pension & Ret. Sys.*

17  *v. Student Loan Corp.*, 951 F. Supp. 2d 479, 504 (S.D.N.Y. 2013).  Rather, a plaintiff

18  must plead that "the truth became known" and a "corrective disclosure" entered the

19  market during the class period, causing a stock price drop from which the plaintiff

20  claims a loss.  *Dura*, 544 U.S. at 347; *Brown*, 2014 WL 523166, at *5 ("[s]uch a

21  requirement ensures that the market actually learns of and reacts to the specific fraud

22  alleged by the plaintiff, as opposed to reacting to reports of" other negative news

23  affecting the company).

24  Here, the SAC realleges the same two purported "corrective disclosures" as the

25  CAC: (1) the September 6, 2020 *WSJ* article (Ex. B) reporting that "[t]he Trump

26  Administration is weighing whether" to add SMIC to the Entity List and (2) the

27  September 26, 2020 *Reuters* article (Ex. G) reporting that the Commerce Department

28  had sent a letter to "[s]uppliers of certain equipment to [SMIC]," advising them that

they "will now have to apply for individual export licenses" in order to continue to do so in light of a "*risk*" that equipment supplied to SMIC "*could be used* for military purposes." SAC ¶¶ 67, 69 (second emphasis added).

In its Prior Ruling, the Court concluded that these same loss causation allegations were "wanting" because neither of these two disclosures "appear[s] to have 'revealed' any 'truth'" underlying SMIC's alleged misstatements. Prior Ruling at 17-18. As the Court explained, (1) "the first revelation … only 'reveals' what the Trump administration was thinking about doing and what SOS 'argue[d]' in its report", and (2) "what the Commerce Department actually said" in the second disclosure "was that there was an 'unacceptable *risk*' that equipment supplied to SMIC could be used for military purposes." *Id.* at 18. Neither of these disclosures is sufficient to plead loss causation, as Ninth Circuit precedent makes abundantly clear.

For instance, in *Curry v. Yelp Inc.*, the Ninth Circuit explained that, "[a]lthough a securities fraud plaintiff need not allege an outright admission of fraud to survive a motion to dismiss, the 'mere "risk" or "potential" for fraud is insufficient to establish loss causation.'" 875 F.3d 1219, 1225 (9th Cir. 2017) (holding that *WSJ* article reporting FTC's release of over 2,000 customer complaints of alleged wrongdoing by company was insufficient to plead loss causation, expressly rejecting plaintiff's "where there is smoke, there must be fire" approach). Rather, as the Ninth Circuit has made clear, there must be a "disclosure of actual wrongdoing." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008) (noting that Supreme Court and Ninth Circuit precedent do not "support the notion that loss causation is pled where a … disclosure reveals a 'risk' or 'potential' for widespread fraudulent conduct"); *Loos v. Immersion Corp.*, 762 F.3d 880, 890 n.3 (9th Cir. 2014), (as amended Sept. 11, 2014) ("[T]he announcement of an investigation, 'standing alone and without any subsequent disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything.'"); *In re Almost Fam., Inc. Sec. Litig.*, 2012 WL 443461, at *12 (W.D. Ky. Feb. 10, 2012) ("If the disclosure of a mere *risk* of fraud was enough to trigger loss

causation, a private cause of action for securities fraud would accrue every time an allegation or rumor of wrongdoing circulated.").  In short, while the two "corrective disclosures" Plaintiff identifies were, no doubt, viewed as "bad news" by SMIC investors, that is insufficient to plead loss causation.  *See Brown*, 2014 WL 523166, at *5; *Okla. Firefighters Pension & Ret. Sys.*, 951 F. Supp. 2d at 504.

Nor does the SAC's emphasis on *post*–class period events and disclosures – i.e., those occurring after September 26, 2020 – do anything to save the SAC's loss causation allegations.  *See, e.g.*, SAC ¶¶ 72-77.  As the Ninth Circuit has made clear, *post*–class period disclosures have no legal relevance whatsoever to the loss causation analysis.  *See, e.g.*, *Loos*, 762 F.3d at 890 (rejecting plaintiff's attempt to "save his loss causation theory by arguing that two post-class period disclosures 'solidif[ied] the causative link' between the fraud and his loss"); *Lloyd v. CVB Fin. Corp.*, 2012 WL 12883517, at *26 (C.D. Cal. Aug. 21, 2012) ("[P]ost-class period revelations" cannot "support a finding of loss causation, since, as alleged by plaintiff, the class period ended a month earlier[.]").  This stands to reason: obviously, disclosures made *after* September 26, 2020 (i.e., the end of the class period) could not possibly have affected the stock price *on or before* that date.[9]

Plaintiff's failure to adequately allege loss causation, standing alone, requires dismissal of the SAC, with prejudice.  As demonstrated in the next section, the SAC also fails to adequately allege a strong inference of scienter, which provides a separate and independent basis on which to dismiss the SAC.

## B.   Plaintiff Again Fails to Adequately Allege Scienter

A separate but equally "critical ingredient" of a federal securities fraud claim is

---

[9] Moreover, and in any event, as discussed in the following section, none of the *post*–class period disclosures to which Plaintiff points – even if they were otherwise relevant to the loss causation analysis (which they are not, for the reasons discussed above) – reveals any definitive finding by the U.S. Government that SMIC in fact manufactures and supplies products for military end use (let alone any admission by SMIC to that effect).

allegations that "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Nguyen*, 962 F.3d at 408 (quoting 15 U.S.C. § 78u-4(b)(2)). The "requisite state of mind" for these purposes – scienter – is "a mental state embracing intent to deceive, manipulate, or defraud." *Id.* at 414 (quoting *Tellabs*, 551 U.S. at 319).

As the Ninth Circuit recently observed, "[t]he PSLRA's 'strong inference' requirement has teeth. It is an 'exacting' pleading obligation, that 'present[s] no small hurdle for the securities fraud plaintiff.'" *Id.* (citations omitted). A securities fraud complaint "will [only] survive a motion to dismiss" under this standard "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (quoting *Tellabs*, 551 U.S. at 324). To determine whether a plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider "plausible, nonculpable explanations for the defendant's conduct." *Tellabs*, 551 U.S. at 323-24. "[T]hough not impossible, this 'is not an easy standard to comply with – it was not intended to be – and plaintiffs must be held to it.'" *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (quoting *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)).

### 1. The SAC Fails to Adequately Allege That Defendants Had a Financial Incentive to Artificially Inflate the Price of SMIC ADRs

As this Court pointedly observed in its Prior Ruling, "[t]he question for scienter is whether a defendant's conduct is 'designed to deceive or defraud *investors*' [] or 'presents a danger of misleading *buyers or sellers*'" of the company's securities. Prior Ruling at 17 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976); *Nguyen*, 962 F.3d at 414; *Schueneman*, 840 F.3d at 705). "Crucially," however, the SAC – like the CAC before it – fails to adequately allege that SMIC or the Individual Defendants had a "financial incentive" to "engage in fraud to artificially inflate the price of ADRs," as there is no "allegation of any insider profiting from sales or otherwise capitalizing

on the alleged fraud." *Id.* at 15-16 (citation omitted).   SMIC submits that this is dispositive on the question of scienter.  *See, e.g.*, *Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018) (noting that "the lack of stock sales" by insiders "detract[s] from a scienter finding"); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *13 (C.D. Cal. Aug. 21, 2009) ("[A] strong inference of scienter is negated when there is an absence of stock sales or where such sales are minimal.").

### 2.   The U.S. Government Never Confirmed the Accuracy of the SOS Report

In its Prior Ruling, the Court also observed that "[i]t is not at all yet clear that an intent to illicitly obtain American technology" – even if adequately alleged (and here it is not) – "amounts to the type of scienter necessary to sustain a securities fraud complaint."  Prior Ruling at 17 (citing *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012) ("Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness.")).  Assuming for the sake of argument that this theory could suffice, however, the Court observed that, here, it would require, at a minimum, a "convincing communication from the Government" that "it was able to verify the material reflected in the SOS Report" and that "the report was indisputably accurate."  *Id.* at 15-16.  That never happened. "Instead," as the Court noted, the U.S. Government "simply cited a 'risk' with regard to SMIC and ultimately offered only an Entity List designation – roughly three months after the close of the proposed class period – due to a vague citation to 'China's military-civil fusion (MCF) doctrine and evidence of activities between SMIC and entities of concern in the Chinese military industrial complex.'"  *Id.* at 15 (citation omitted).

Nor do any of the additional *post*–class period events and disclosures to which the SAC now points provide any such "convincing communication" from the U.S. Government confirming the accuracy of the SOS report.  *See, e.g.*, SAC ¶¶ 72 (Nov. 29, 2020 *Reuters* report that "[t]he Trump administration is *poised* to add China's top

chipmaker SMIC and national offshore oil and gas producer CNOOC to a blacklist of *alleged* Chinese military companies, according to a document and sources, curbing their access to U.S. investors and escalating tensions with Beijing weeks before President-elect Joe Biden takes office" (emphases added)), 73 (Dec. 3, 2020 *Reuters* report that "[t]he Trump administration [had now in fact] added China's top chipmaker, SMIC, and oil giant CNOOC to a blacklist of *alleged* Chinese military companies" based on an "'unacceptable risk' that equipment supplied to [them] *could be used* for military purposes"; the report further noted that the move "did not initially trigger any penalties" and, according to SMIC, "reflected a fundamental misunderstanding by the U.S. administration of the end-uses of its business and technology" (emphases added)), 74-75 (Dec. 18, 2020 announcement that the Trump administration had added SMIC, along with seventy-six other Chinese companies, to the Entity List based on unspecified "activities between SMIC and entities of concern in the Chinese military industrial complex," not based on any express finding that SMIC had violated any laws or that it in fact manufactured and supplied products for military end use), 76 (Dec. 22, 2020 letter from two Republican congressman "urging" the Commerce Department to place "harsher sanctions on SMIC," which urgings, it appears from the SAC, were not heeded), 77 (President Biden's June 3, 2021 issuance of a new wide-ranging executive order restricting U.S. investment in Chinese companies based on military, surveillance, and human rights concerns; the order identified fifty-nine Chinese companies, including SMIC and other tech giants, without making any specific finding that SMIC had violated any laws and/or in fact manufactured and supplied products for military end use). On the contrary, as noted above, the U.S. Government (according to its own published data) has – since the fall of 2020 – consistently approved licenses for U.S. suppliers to continue shipping components to SMIC, thus undercutting the core theory of Plaintiff's case. *See* Ex. F (through Apr. 2021, the U.S. Government had approved nearly 200 such licenses, over 90% of those sought).

As the Court previously explained, the absence of any "convincing

13

communication" from the U.S. Government confirming the accuracy of the SOS report "poses multiple problems for Plaintiff's case," especially with respect to the element of scienter.  Prior Ruling at 16 (explaining that this "leads the Court to conclude that it is at least as cogent and compelling that SMIC was *not* engaging in the conduct reported by an outsider to the United States, and thus – by definition – could not have held the requisite state-of-mind").  At oral argument on SMIC's prior motion to dismiss, Plaintiff attempted – unsuccessfully – to convince the Court otherwise by pointing to two decisions that, according to Plaintiff, stand for the proposition that a report by an "outsider" (here, "SOS") is sufficient to allege scienter.  Neither decision Plaintiff cited supports his position on this point.

The defendant company in *In re China Education Alliance, Inc. Securities Litigation* – CEU, "a Chinese-based corporation that purports to provide for-profit education services in Northeast China" – was alleged to have "overstated its revenue and profits during the Class Period by 'exponential proportions.'" 2011 WL 4978483, at *1 (C.D. Cal. Oct. 11, 2011).  This was evidenced by the fact that the company maintained "two sets of books: (1) an accurate set of financial statements filed with Chinese regulators … and (2) a second set of 'false financial statements filed with the SEC.'"  *Id.*  Although the decision discusses an analyst report issued by Kerrisdale Capital, the report is not even mentioned in the section of the court's decision addressing scienter.  *See id.* at *6-7.  Rather, in determining that the complaint in that case adequately alleged scienter, the court pointed to the plaintiffs' allegations, among others, that "CEU has filed significantly disparate revenue figures in China and the United States; that plaintiffs' own investigators toured CEU's on-site 'state-of-the-art' facility in China only to find it an empty building; [and] that witnesses in China told plaintiffs' investigators that CEU was not the owner of the building." *Id.* at *6.  That is a far cry from the scienter allegations Plaintiff provides here.

*In re Silvercorp Metals, Inc. Securities Litigation* likewise involved discrepancies between the data that the defendant company, which operated mines in China, publicly

reported to the SEC and what it reported to Chinese authorities.  26 F. Supp. 3d 266, 269-70 (S.D.N.Y. 2014).  An investor report pointed out that "the metrics [the company] reported in the SEC filings were dramatically different from those filed with Chinese authorities" and the company did not dispute the accuracy of the public filings or published data.  *Id.* at 270.  A strong inference of scienter in that case was also supported by allegations (a) that the defendants "had a strong motive to inflate the price of the Company's stock during the Class Period," as the company had a dire need to raise capital, which it did through a contemporaneous secondary stock offering, (b) attributed to a confidential witness,[10] and (c) relating to an independent corruption investigation by authorities in Canada.  *Id.* at 271-72, 276 (internal quotations and citations omitted).  No such particularized factual allegations are present here.

### 3.    The SAC's Other Scienter Allegations Are Unavailing

In the CAC, Plaintiff attempted to plead a strong inference of scienter by pointing to (1) a prior role that SMIC's chairman, Mr. Zhou, once held in China's Ministry of Industry and Information Technology ("MIIT"); (2) the fact that certain Chinese government and Communist Party officials once toured SMIC facilities; and (3) SMIC's voluntary departure from the Commerce Department's VEU program in 2016.  *See* SAC ¶¶ 79, 80, 82 (which repeat these allegations).[11]  The Court agreed with SMIC that, viewed either individually or holistically, these allegations did not establish an inference

---

[10] Unlike many, if not most, securities fraud actions, the SAC here does not contain any allegations sourced to "confidential witnesses" – such as former employees, government officials, suppliers, or other industry players – that might support an inference that SMIC deliberately misled investors.  *See, e.g.*, *In re Under Armour Sec. Litig.*, 409 F. Supp. 3d 446, 461 (D. Md. 2019) (failure to plead scienter where complaint's allegations included "no confidential witnesses, no admissions, no internal documents, and no witnessed discussions").

[11] The CAC also suggested that SMIC's (1) "exculpatory statements on September 5 and 28" and (2) institution and maintenance of policies designed to prevent violation of export controls somehow support an inference of scienter.  *See* SAC ¶¶ 81, 86 (which repeats these allegations).  As the Court observed, such theories are circular as they "presume[] the accuracy of [Plaintiff's] falsity allegations," thereby conflating separate and distinct elements of a 10b-5 claim.  Prior Ruling at 15.

of scienter that was "cogent and at least as compelling as any opposing inference" standard.  *See* Prior Ruling at 15-17; *see also* Docket No. 43, at 20-24.

In addition to repeating these same allegations that the Court has already found insufficient, the SAC now includes the following new scienter allegations in an attempt to satisfy the *Tellabs* standard:

- That two "state owned or controlled" Chinese investment companies own a minority stake in SMIC (SAC ¶ 83 (also repeated verbatim in ¶¶ 87, 95));

- That non-SMIC entities (the "Shanghai Government" and MIIT) allegedly removed articles from *their own* websites that purportedly reflected unspecified information relating to alleged meetings between unidentified Chinese government personnel and unidentified SMIC executives (SAC ¶ 84 (also repeated verbatim in ¶¶ 88, 96)); and

- Based on a selective and misleading partial quote of President Trump's Executive Order 13959, that "SMIC was motivated to 'exploit[] United States investors to finance the development and modernization of [the Chinese] Military' by selling stock in the United States while secretly working for the Chinese military as part of the Military-Civil Fusion doctrine" (SAC ¶ 85 (also repeated verbatim in ¶¶ 89, 97)).

These additional allegations, even viewed holistically and together with Plaintiff's prior allegations, do not give rise to an inference of scienter that is "cogent and at least as compelling as any opposing inference" of nonfraudulent intent.  *Tellabs*, 551 U.S. at 324.

*First*, the SAC does not explain how or why the fact that two "state owned or controlled" Chinese investment companies own a minority stake in SMIC (SAC ¶ 83) would create an "intent" on the part of SMIC or Zhou to "deceive or defraud *investors*" or to engage in conduct that "presents a danger of misleading *buyers or sellers*."  Prior Ruling at 17 (citations omitted).  As a threshold matter, the SAC makes clear that the ownership percentages of the two entities in question were publicly disclosed by SMIC in its 2019 Annual Report, which was issued prior to the start of the class period.  SAC ¶ 83.  Moreover, neither of the Chinese investment companies in question is alleged to have (or have had) a controlling stake in SMIC or to have any specific ties to the Chinese military.  And, indeed, as reflected in the SAC itself, top U.S. asset managers Vanguard

Group and BlackRock Inc. likewise each own a minority stake in SMIC. *Id.* ¶ 73. The bottom line is that stock ownership, in and of itself, does not support a showing of intent, or raise an inference of deliberate or conscious recklessness – especially where, as here, there is no evidence of unusual trading, trading at suspicious times, or trading in suspicious amounts. *See, e.g.*, *In re Maxim Pharms., Inc. Sec. Litig.*, 2005 WL 8179524, at *8 (S.D. Cal. 2005).

*Second*, the SAC likewise fails to explain how the purported removal by the "Shanghai Government" and/or MIIT of content from their own websites (SAC ¶ 84), even if accepted as true, provides any evidence of SMIC's supposed fraudulent intent vis-à-vis its own investors. The SAC fails to allege (a) when the information in question was originally posted, (b) when it was removed from the websites in question, (c) whether the removal of content from these non-SMIC entities' websites was an irregular occurrence, (d) when the supposed underlying "meetings between Chinese government personnel and executives of SMIC" took place, (e) which government personnel and/or SMIC executives were involved, or (f) the subject matter of such meetings. Further, the Court has already held that Plaintiff's allegations concerning actual tours that certain Chinese government and Communist Party officials took of SMIC facilities did not – even when viewed holistically with Plaintiff's other allegations – give rise to a strong inference of scienter. Prior Ruling at 15-17. And, indeed, as SMIC has pointed out, Plaintiff's own allegations in this case make clear that U.S. Government officials have also met with SMIC executives at SMIC facilities on "several" occasions. SAC ¶ 65. Plaintiff again fails to allege facts sufficient to establish that any such tours or meetings with Chinese officials give rise to an inference of scienter that is "at least as compelling as any competing inference." *Tellabs*, 551 U.S. at 324.

*Finally*, Plaintiff selectively and misleadingly quotes from then President Trump's November 12, 2020 (i.e., post–class period) Executive Order 13959 in an effort to manufacture some evidence of fraudulent intent on SMIC's part. SAC ¶ 85.

What that executive order actually said was that "the PRC exploits United States investors to finance the development and modernization of its military" and compels private business to "support the PRC's military, intelligence, and security apparatuses and aid in their development and modernization." *Id*. ¶ 29. SMIC itself is not even mentioned in the order. And, as the Court observed with respect to Plaintiff's prior scienter allegations, this assertion "largely presumes the accuracy of [Plaintiff's] falsity allegations – i.e., that SMIC was manufacturing products and providing services for military end-use or military end-users" – thereby wrongly conflating two separate elements of a 10b-5 claim. Prior Ruling at 15. Any inference of scienter on this basis is also conclusively undercut by the fact that, after this post–class period order issued by then-President Trump, the U.S. Government continued to readily grant licenses to U.S. suppliers to ship components to SMIC. Ex. F.

*\*\*\**

In sum, even viewed holistically, the SAC's allegations do not establish an inference of scienter that is "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. This provides an independent basis on which to dismiss the SAC, with prejudice. *See, e.g.*, *Zucco Partners*, 552 F.3d at 1007 (affirming dismissal with prejudice of second amended 10b-5 complaint for failure to cure deficiencies in prior complaint).

## C. The SAC Fails to Plead an Actionable Misstatement or Omission

"The PSLRA has exacting pleading requirements for 'falsity.'" *Metzler*, 540 F.3d at 1070. "A litany of alleged false statements, unaccompanied by the pleading of *specific facts* indicating why those statements were false, does not meet this standard." *Karam v. Corinthian Colls., Inc.*, 2012 WL 8499135 (C.D. Cal. Aug. 20, 2012), at *5 (emphasis added). For the reasons set forth below, SMIC submits that the SAC also fails to plead any threshold material misstatement or omission. This provides a third independent basis on which the Court can and should dismiss the SAC, with prejudice.

1.   **The SAC (like the CAC) Fails to Plead Securities Fraud Based on SMIC's Statements of Legal Compliance**

In the SAC, Plaintiff again challenges various statements concerning SMIC's compliance with applicable laws.  Such statements include the following:

> <u>2019 SMIC Annual Report</u>: "At SMIC, we comply with strict legal requirements for corporate governance, financial accounting, and transparent reporting.  Our business practices also are … in accordance with all the laws, rules, and regulations of the countries where we operate."  SAC ¶ 56.

> <u>May 14, 2020 analyst call</u>: "And we follow the rules for the compliance, and so far, perfectly."  *Id.* ¶ 58.

> <u>Corporate Social Responsibility Report filed with HKEX on July 7, 2020</u>: "As an international company, SMIC must comply with strict legal requirements for corporate governance, financial accounting, and transparent reporting.  Our business practices also must be ethical, safe, environmentally sound, and fair to our employees, in accordance with all the laws, rules, and regulations of the countries where we operate."  *Id.* ¶ 60.

> ***

> The United States and many other countries have joined the international export control system.  Suppliers and customers in these countries generally need to obtain export licenses to transport controlled items (such as equipment, parts, materials, software, or technology) to China.  We, as well as relevant suppliers and customers, strictly abide by the restrictions and regulations of these export licenses."  *Id.* ¶ 62.

> <u>SMIC statement issued Sept. 5, 2020</u>: "SMIC solemnly declares that the Company … is an international semiconductor foundry strictly complying with the laws and regulations of all jurisdictions where it performs its businesses."  *Id.* ¶ 65.

- The SAC alleges that the foregoing statements were materially false and misleading when made for failing to disclose that, at the time the statements were made, SMIC was violating U.S. export control laws.  *See id.* ¶¶ 57, 59, 61, 63.  The Court has already rejected this theory (*see* Prior Ruling at 11-14), and the SAC pleads no new facts that would warrant the Court's revisiting its prior conclusion.

- In its Prior Ruling, the Court also observed that Plaintiff "does not identify any United States law or export control regulation that *SMIC* was not complying with at the time" it made the legal compliance statements in question.  Prior Ruling at 12; *see also Ikeda v. Baidu, Inc.*, 2021 WL 1299046, at *9-10 (N.D. Cal. Apr. 7, 2021) (dismissing 10b-5 claim based

19

on legal compliance statements where, among other things, "Plaintiff has not alleged specific facts that suggest that, at the time of the [statements in question], [the company] was not in compliance with [any] regulations"). Indeed, the Court noted, the "only law or regulation Plaintiff [] identified in the Complaint is 15 C.F.R. 744.21, but [] this regulation only applies to *United States suppliers*, not to *SMIC*" itself. Prior Ruling at 12; *see also Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *13-14 (S.D.N.Y. 2021) (failure to allege falsity with respect to "legal compliance" statement where law allegedly violated did not apply to foreign defendant company). But, the Court continued, "[n]one of the falsity theories advanced in connection with these statements relate to whether or not any of SMIC's suppliers were or were not complying with any law or export control or regulation." Prior Ruling at 11; *see also id.* at 13 ("Plaintiff's theories of falsity as to these statements do not involve noncompliance *by suppliers*."). Thus, the Court concluded, even SMIC's statement that "'relevant suppliers … strictly abide by the restrictions and regulations of' export licenses has not been shown to be false or misleading because Plaintiff has not pointed to any supplier acting contrary to Section 744.21(a) at the time the statements were made, nor has he cited to any other export license terms that the supplier was not 'abid[ing] by' (let alone that SMIC knew about it)." *Id.* at 12-13; *see also id.* at 13 ("Plaintiff has not identified even any supplier – let alone SMIC itself – that was not complying with Section 744.21-related direction.").

- "Moreover," the Court continued, "SMIC itself was not placed on the 'Entit[y] List' until several months after these statements were made and the proposed class period ended, so even if that placement (or the announcement of it) clearly demonstrated a conclusion that SMIC had been violating laws or regulations, it would not have made the months-earlier statements false *when made*." *Id.* at 13. "And," in any event, the Court concluded, "as the CAC itself reveals, SMIC's placement on the Entit[y] List was not accompanied by a statement that SMIC had been violating any law or regulation at the time the statements in question were made." *Id.*[12]

- Accordingly, the Court found that the challenged statements "concerning legal compliance are not actionable misrepresentations/omissions, and that their falsity has not been sufficiently alleged, on the current state of the allegations." *Id.* at 14. The SAC does not cure any of these deficiencies –

---

[12] For similar reasons, the Court rejected Plaintiff's reliance on the September 26, 2020 notice that U.S. exporters received pursuant to Section 744.21(b), especially given that "that notice still only reflected 'an "unacceptable risk" equipment supplied to [SMIC] could be used for military purposes,' CAC ¶ 61, not that such equipment *had* been supplied to military end users or for military end uses" in violation of the law and because the "notice came after all of the … statements asserting compliance with the applicable laws[.]" *Id.* at 13.

nor could it – nor does it otherwise provide any basis for the Court to reconsider its decision on this issue.

### 2.   SMIC's Optimistic Statements Concerning the "Strength" of Its Relationships with Suppliers and Its "Confidence in the Future" Are Inactionable Even on an Omission-Based Theory

The SAC – like the CAC before it – also challenges the following statement that appeared in an April 23, 2020 "Letter to Shareholders" that accompanied SMIC's 2019 Annual Report:

> We also have strengthened mutual trust and cooperation with domestic and overseas customers and suppliers. The foundation laid by these vigorous efforts has further strengthened our confidence in the future.

SAC ¶ 54.  As SMIC explained on the prior motion to dismiss, courts have routinely held that such generalized statements of corporate optimism or "puffery" concerning the strength of a company's business relationships and its prospects for the future are immaterial as a matter of law and therefore are not actionable.  *See, e.g.*, *City of Royal Oak Ret. Sys. v. Juniper Networks*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (company's statements that it has "strong partners" in "[b]oth Verizon and AT&T" and that its "demand indicators are strong" held to be immaterial statements of corporate optimism); *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (company's "aspirational" statements reflecting its desire to "build trust in everything" and "conduct[] business consistent with the high ethical standards" held immaterial); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) (company's statements that it was "building trust" and confidence in the future held inactionable).  As the court explained in *Veal*, "[t]he distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions." *See Veal,* 423 F. Supp. at 804.  SMIC's statements concerning the "strength" of its relationships with suppliers and its "confidence in the future" fall squarely into the former category.

In its Prior Ruling, the Court responded that SMIC's argument in this regard did

21

"not appear to acknowledge that Plaintiff's theory here is *omission*-based" and, accordingly, concluded that SMIC had not "made a convincing argument why 'puffery' … cannot still contribute to an actionable omission, even if it cannot constitute an actionable *affirmative* misrepresentation or misleading statement."   Prior Ruling at 11.   The Court acknowledged, however, that "[p]erhaps there is a case to be made tha[t] an omission-based theory makes no difference when it comes to application of the 'puffing' doctrine, but if so SMIC has not yet made it."   *Id.*

Here, SMIC makes that case by respectfully directing the Court to the following authorities.   *See In re PharmaCielo Ltd. Sec. Litig.*, 2021 WL 4459756, at *1, *4 (C.D. Cal. Apr. 16, 2021) (finding company's statements regarding "progress" in building facility to be inactionable "corporate 'puffery,'" even though thrust of plaintiff's claim was that defendants "failed to disclose" contrary information)*; In re Verifone Sec. Litig.*, 2016 WL 1213666, at *7 (N.D. Cal. Mar. 29, 2016) (finding that challenged statements were "akin to corporate optimism and opinion, and are therefore not actionable as a material misrepresentation *or omission*" (emphasis added)); *Plumley v. Sempra Energy*, 2017 WL 2712297, at *7 (S.D. Cal. June 20, 2017) (rejecting plaintiff's omission theory where statements were "too nonspecific and unmeasurable … more akin to corporate puffery" and did not "resemble quantifiable statements upon which a reasonable investor would rely in deciding whether to purchase or sell a security"); *see also Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *13 (S.D.N.Y. Sept. 21, 2021) (agreeing with defendants that "even if the challenged statements satisfy an omissions theory, they are still non-actionable corporate optimism or puffery"); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 189 (D. Conn. 2014) (corporate puffery is "considered to be inactionable under the securities laws regardless of whether [defendants] omit related information").

Moreover, and in any event, SMIC's optimistic statements in April 23, 2020, that it had "strengthened mutual trust and cooperation with domestic and overseas customers and suppliers" and was therefore "confident in the future" (SAC ¶ 54) have, if anything,

been borne out – *not proven false* – by subsequent events, as (a) U.S. suppliers continued in droves – even after the September 2020 purported "corrective disclosures" – to seek and successfully obtain licenses from the U.S. Government to continue to ship components to SMIC (Ex. F); (b) SMIC "reported record revenue and a surge in profit" in 2021;[13] and (c) SMIC's stock price on the HKEX (which closed at HKD 14.82 on April 23, 2020) has consistently traded higher ever since.[14]

For the foregoing reasons, SMIC's statements reflected in paragraph 54 of the SAC are inactionable as a matter of law, *either* as an affirmative misstatement *or* on an omissions-based theory.

### 3. Plaintiff Fails to Adequately Plead That SMIC Manufactured Products for Military End Use

Finally, Plaintiff again asserts that certain statements SMIC made during the class period disavowing the notion that it manufactures semiconductors for military end use were materially false when made. *See id.* ¶¶ 58-59, 65-66. In its Prior Ruling, the Court concluded that Plaintiff adequately pleaded falsity with respect to this theory. Prior Ruling at 14 (noting that "the Court is to accept factual allegations as true (with certain caveats with regard to scienter under *Tellabs*), even where there might be reasons to suspect the motives of a source"). While SMIC respectfully disagrees with that conclusion and preserves the right to contest it in connection with any de novo appeal that may be taken from the ruling on the instant Motion, it will not repeat the same arguments here that it advanced in connection with the prior motion. *See* Docket No. 43 at 17-19.

SMIC notes, however, that the alleged misstatement to this effect made on Saturday, September 5, 2020 (SAC ¶ 65), is not actionable under any circumstances,

---

[13] *See* Ex. H (SMIC's Fourth Quarter 2021 Earnings Release); Ex I (Feb. 11, 2022 CNBC report that "China's biggest chipmaker SMIC reports record revenue despite U.S. sanctions").

[14] *See* Ex. J (table reflecting SMIC's weekly average closing stock price on the HKEX from Apr. 20, 2020, to Feb. 21, 2022).

1   since – according to Plaintiff's own allegations – that purported misstatement was

2   "corrected" the *very next day* on *Sunday, September 6, 2020*, when *WSJ* published an

3   article that "revealed not only that the Trump Administration was considering placing

4   SMIC on the Entit[y] List but also provided details and quotations from the SOS report."

5   Docket No. 44, at 25. If, as Plaintiff contends, the alleged misstatement was made on

6   *Saturday, September 5, 2020*, and "corrected" the very next day on *Sunday,*

7   *September 6, 2020*, it cannot – as a matter of law and logic – serve as the basis for a

8   securities fraud claim by Plaintiff, who (it is undisputed) did not purchase SMIC ADRs

9   in the intervening hours. Docket No. 12-2. As the Supreme Court has explained, "*if*

10  *the plaintiff did not buy or sell the stock after the misrepresentation was made but before*

11  *the truth was revealed*, then he could not be said to have acted in reliance on a fraud-

12  tainted price" and therefore has no claim. *Halliburton Co. v. Erica P. John Fund, Inc.*,

13  573 U.S. 258, 278 (2014) (emphasis added). This indisputably renders this alleged

14  misstatement inactionable as a matter of law.[15]

15  **V.   CONCLUSION**

16      For the foregoing reasons, the SAC should be dismissed in its entirety, with

17  prejudice.[16]

18  //

19

20  //

21  _____

    [15] While SMIC objects to Plaintiff's attempt to add two new plaintiffs (McCormick and

22  O'Keefe) to this action without Court approval, we note that neither of them purchased
    SMIC ADRs between September 5 and 6, 2020, either. Docket No. 41-1 [Ex. A to

23  CAC]. Nor could any absent class member have done so, as trading on the OTCQX is
    closed on weekends. *See Market Hours*, https://www.otcmarkets.com/market-hours

24  (accessed on Feb. 24, 2022).

25  [16] The SAC also purports to assert a claim for violation of Section 20(a) of the Exchange
    Act against the Individual Defendants. As noted above, because the Individual

26  Defendants have not been served with the SAC (or any prior complaint), this Motion is
    brought solely on SMIC's behalf. However, because the SAC fails to state a claim under

27  Section 10(b), as demonstrated above, the Section 20(a) claim also necessarily fails.

28  *See Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).

1 | Dated:  February 25, 2022

Respectfully submitted,

2 | **WINSTON & STRAWN LLP**

3

4 | By:/s/ John E. Schreiber
John E. Schreiber
5 | Aaron C. O'Dell
Lara Markarian

6 | *Attorneys for Defendant*
SEMICONDUCTOR MANUFACTURING
7 | INTERNATIONAL CORPORATION

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMIC'S MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 2:20-cv-11219-GW-AFM